THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOSE MENDOZA, Defendant-Appellee.

Fifth District   No. 5—91—0467

Opinion filed September 17, 1992.

Paula Phillips, State's Attorney, of Effingham (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Lawrence J. O'Neill, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The People of the State of Illinois appeal from an order of the circuit court of Effingham County, entered June 10, 1991, suppressing evidence consisting of over 15 pounds of cannabis found in the gas tank of defendant's automobile. We reverse the suppression order and remand this cause for prosecution.

On January 24, 1991, defendant, Jose Luis Mendoza, was charged by information with the offenses of unlawful possession of cannabis (Ill. Rev. Stat. 1989, ch. 56½, par. 704(e)), unlawful possession with intent to deliver cannabis (Ill. Rev. Stat. 1989, ch. 56½, par. 705(e)), unlawful possession of cannabis without cannabis tax (Ill. Rev. Stat. 1989, ch. 120, par. 2160), and cannabis trafficking (Ill. Rev. Stat. 1989, ch. 56½, par. 705.1).

Hearing on defendant's motion to suppress was held on April 29, 1991. The following evidence was adduced. The defendant, a Mexican, does not understand the English language. An interpreter was appointed to assist him in court. The defendant called as an adverse witness Illinois State Trooper Marla Sapp. She had been on duty from 7 a.m. until 3 p.m. on January 23, 1991. At approximately 9:40 that morning she observed a vehicle owned by defendant. Sapp followed that vehicle for five to seven miles. Defendant was a passenger in the vehicle. The vehicle had Texas license plates.

Sapp stopped the vehicle because the driver's view was obstructed by fuzzy dice and several other items hanging from the rearview mirror in violation of section 12—503(c) of the Illinois Vehicle Code. (Ill. Rev. Stat. 1989, ch. 95½, par. 12—503(c).) The driver of the vehicle was Indelacio Valencia, defendant's cousin. Sapp did not observe the vehicle violate any other traffic laws. Sapp testified that, while the dice did not obstruct the driver from seeing out his rearview mirror, they could have obstructed his view out the front window. In Sapp's opinion the objects hanging from the rearview mirror materially ob-

structed the driver's view. Sapp had made several arrests for obstruction of view during her five years with the Illinois State Police, the last time being a week and a half before the hearing. Sapp issued Valencia a warning ticket for driving with an obstructed view.

Sapp asked Valencia if she could search the vehicle. She was suspicious because there was a map in the car and Valencia and Mendoza seemed nervous. Also, when she asked Valencia whether he had ever been arrested before, Valencia lied and told her he had not. Sapp had already checked Valencia's criminal history over her car radio. Further, defendant's car was being followed by a car owned by Valencia. This other car did not stop when Valencia was pulled over. This also raised Sapp's suspicions. When Sapp asked Valencia for consent to search, Valencia was seated in Sapp's vehicle. Sapp knew that Valencia was not the owner of the vehicle, but that defendant was. Sapp did not speak with defendant because she did not speak Spanish and defendant did not speak English.

Sapp radioed for assistance from Sergeant Oliverio. Troopers are not permitted to search a vehicle without assistance. Sapp had first contacted Trooper Daniels, who arrived but could not stay. Sapp did not contact these other troopers until after she had stopped defendant's vehicle.

Sapp identified the written consent to search form which she had used in this instance. It is written in English on one side and in Spanish on the other side. Valencia consented verbally to the search and also signed the Spanish side of the consent-to-search form.

When Trooper Oliverio arrived, he asked Valencia to translate his English to defendant and translate defendant's Spanish to him. Defendant indicated that he could read and write Spanish, and he was given a written consent-to-search form.

The troopers then conducted a search of defendant's vehicle. While they did not find any drugs, they did find evidence that the gas tank on the vehicle had been removed. There were fresh scratches on the tank and the dust on the straps which held it to the vehicle had been disturbed. The gas tank was leaking and there was an extra can of gas and some hoses in the vehicle. Trooper Oliverio asked Valencia and defendant if he could conduct a further search of the gas tank. Both Valencia and defendant agreed. Valencia and defendant were free to refuse and leave.

The vehicle was driven to a nearby service station, where it was placed on a hoist or lift. Valencia and defendant remained in the garage area with the vehicle. The gas tank was removed from the car and lowered to the ground. By shining a flashlight inside the gas

tank, Sapp could see metal containers inside the tank. The troopers never sought any additional consent specifically to remove the gas tank or look inside it. Sapp testified, however, that Valencia and defendant knew that that was the trooper's intention.

After the troopers viewed the metal containers inside the gas tank, Valencia and defendant were taken to police headquarters. The gas tank was taken to a nearby welding shop, where it was cut open. The metal containers were also cut open and were found to contain marijuana.

State Police Sergeant Oliverio was also called as an adverse witness by defendant. He responded to a call for assistance from Trooper Sapp on January 23, 1991. Sapp did not call Oliverio until after she had stopped defendant's vehicle. Oliverio identified the written consent-to-search form used in this instance. The form gives consent to search the entire vehicle including luggage and the contents thereof. Oliverio thinks that the entire vehicle includes the gas tank.

Upon searching the vehicle, Oliverio determined that the gas tank had been removed from the vehicle. Valencia and defendant were free to go even after this search because no contraband had been found. Oliverio advised Valencia that he and defendant were not under arrest. Valencia indicated that he understood that. Oliverio asked Valencia to tell defendant the same thing and to tell defendant that Oliverio was interested in the gas tank specifically. Oliverio believed that Valencia did correctly translate to defendant because defendant's responses were appropriate. Oliverio asked defendant about the gas tank. Oliverio asked if he could inspect the gas tank closer by taking the vehicle to a service station and lifting it. Valencia talked with defendant, received a positive response and agreed to follow Oliverio to the service station. While Oliverio may not have told defendant expressly that he was going to remove the gas tank from the car, that was certainly implied by his explanation that he wanted to look more closely at the gas tank. Defendant knew that Oliverio was looking for contraband. Valencia and defendant followed Oliverio to the service station of their own free will. They were not under arrest. Oliverio was certain that defendant knew he was going to remove the gas tank. Defendant observed while Oliverio removed the gas tank. Neither defendant nor Valencia ever raised any objection to Oliverio removing the gas tank.

After removing the gas tank from the vehicle, Oliverio inserted his expandable baton inside it and felt the metal containers. He knew that they were not factory equipment. Through his experience and training, Oliverio recognized them as a way to smuggle contraband.

Oliverio directed that Valencia and defendant be placed under arrest. Oliverio felt at this point that he had probable cause to arrest defendant based on his training and experience.

The gas tank was taken to a welding shop where it was opened. The containers were removed and opened.

On cross-examination by the State, Oliverio testified that he felt Valencia correctly translated to and from defendant because of defendant's responses. When Oliverio asked Valencia and defendant to follow him to a service station, he made it clear that they were free to refuse and leave. Oliverio did not believe that defendant did anything against his will. Valencia and defendant followed Oliverio to the service station.

Oliverio was alerted by the gas tank for several reasons. It had a small leak which had been patched. The dust line on the straps which held it to the car had been disturbed, indicating that the straps had been moved recently. There were some scratches on the bottom of the tank which were not front to rear, but side to side. This is consistent with a gas tank having been removed from the car and placed on the ground to be worked on. The dust was also disturbed around the bolts which held the straps to the car. The nuts themselves had fresh tool marks on them, showing that they had been removed recently. The fact that the vehicle was also carrying a gas can and hoses indicated a possibility that something was concealed in the gas tank. The area of the gas tank which can hold gas is reduced because of the concealed items, so extra gas is carried.

While at the service station, defendant appeared to be very nervous. He was extremely stressed. After lowering the gas tank from the car, but before removing it, Oliverio observed a nonfactory weld on the tank. It appeared that the tank had been cut in half and then welded back together. He had observed the same thing in other contraband concealment cases. The welding was not done for purpose of repair.

The defendant testified in support of his motion to suppress. He had completed only the second year in school. He does not speak or read English but can read Spanish. He recalled being stopped by the police on January 23, 1991. Defendant acknowledged his signature on the written consent-to-search form. Valencia had told him to sign it. Valencia did not tell defendant that the police wanted to search the gas tank. Valencia told defendant that the police wanted to take the car to a service station to look at it further but did not tell him that they were going to look further at the gas tank. Defendant was not told that the police were going to remove the gas tank. Defendant did

not consent to put the car on the hoist or lift. Valencia was told by the police to do so. Valencia drove the car to the service station. No one asked defendant for permission to remove the gas tank. Defendant signed the consent-to-search form because Valencia told him the police wanted it.

Defendant's court-appointed interpreter testified that there is a difference between the English version of the written consent-to-search form and the Spanish version. While the English version gives consent to search the vehicle including *luggage* and contents thereof, the Spanish version gives consent to search the vehicle including the *trunk* and its contents. The defense rested.

The State called Trooper Sapp to testify. She testified that it was her opinion that the objects hanging from the rearview mirror of defendant's car materially obstructed the driver's view in violation of section 12–503(c) of the Illinois Vehicle Code. When the driver is looking forward and to the right, the objects would materially obstruct his view. Sapp did not radio for assistance until after Valencia was seated in her car and he had lied to her about never having been arrested before. Valencia had already consented to the search. The map in the vehicle caught her eye because it had been highlighted in yellow although the driver told her he had made the trip numerous times before.

Sapp has been specially trained in the highway interdiction program. It is an officer-awareness program to teach officers to dig a little deeper, ask questions, after a traffic stop. Officers are taught to look for things such as conflicting stories, multiple air fresheners or anything that is not normal. They observe whether individuals appear nervous, are unable to look the officer in the eye or evade questions. Based upon her training and experience, Sapp suspected that there might be more involved in the instant traffic stop than a mere traffic violation.

Valencia read the written consent-to-search form and indicated that he understood it. He signed it.

On cross-examination, Sapp testified that she followed defendant's vehicle for approximately seven miles. She observed the objects hanging from the rearview mirror through the back window of defendant's vehicle.

Trooper Oliverio was called to testify by the State. He identified the written consent-to-search form which was signed by defendant. With Valencia interpreting, Oliverio asked defendant where he had had his gas tank repaired. Through Valencia, defendant responded that the gas tank had not been off the car. Oliverio did understand

defendant to say "Lufkin, Texas" in response to the question. When Oliverio handed defendant the written consent-to-search form, defendant appeared to read it. Oliverio asked defendant in Spanish if defendant understood it, and defendant responded that he did.

The State rested. There was no rebuttal.

While the court did not immediately rule on defendant's motion, taking it under advisement, the court did make certain findings of fact immediately after the hearing. The court found that Officer Sapp acted properly in stopping defendant's car. Sapp had testified that she believed that the objects hanging on the rearview mirror constituted a material obstruction of the driver's view in violation of the Illinois Vehicle Code.

The court entered its order by way of docket entry on June 10, 1991. The order initially found that there was no probable cause to search the vehicle and that the search was not incident to a lawful arrest. Therefore, the legality of the search was dependent on consent. The State had failed to show that defendant, who did not read or understand English, gave voluntary consent to the search where the police officers did not understand Spanish and defendant's cousin, who interpreted at the time of the arrest, was not produced at trial and defendant testified at trial that his cousin told him that he had to sign the consent form. Accordingly, the court granted defendant's motion to suppress evidence uncovered in the search. The court further found that, even if defendant's consent to the search was found to be voluntary, it would still suppress the evidence as the search far exceeded the scope of the consent. Because of the language of the Spanish version of the consent-to-search form, defendant could have believed that the search would only include the passenger compartment of the car and its trunk. The search exceeded this scope of consent. It is unreasonable to conclude in this case that defendant's consent to search included consent to remove the gas tank from the car.

The State appeals. We reverse the order of the trial court because we are persuaded that voluntary and valid consent to search the car was given by the car's driver, Valencia, and that this was sufficient to justify the search.

The United States Supreme Court made clear in *United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993, that when the State seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be in-

spected. "Common authority" rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of those having access has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched. (*Matlock*, 415 U.S. at 171 n.7, 39 L. Ed. 2d at 250 n.7, 94 S. Ct. at 993 n.7; *People v. Posey* (1981), 99 Ill. App. 3d 943, 948, 426 N.E.2d 209, 212.) This standard for third-party consent, *i.e.*, the common-authority test, was adopted by the Illinois Supreme Court in *People v. Stacey* (1974), 58 Ill. 2d 83, 88-89, 317 N.E.2d 24, 27.

This rule has been held applicable to motor vehicles. In *People v. Harris* (1990), 199 Ill. App. 3d 1008, 1013, 557 N.E.2d 1277, 1280, a case remarkably similar to the one at bar, it was held that the driver of a car stopped for speeding could validly consent to a search of that car where the owner was a passenger in the car at the time of the stop and did not object to the search. Under Illinois law, a third party may give legally sufficient consent for a search if he has actual authority over the property shared in common with the defendant. The court explained that, by allowing the driver to exercise authority over a vehicle, a defendant assumes the risk that the driver will allow someone to look inside it.

> "A driver of a car has the authority to consent to a search of that car because he is the person having immediate possession and control of the vehicle. [Citation.] As the driver, he has joint access and control over the entire vehicle, including its trunk, glove compartment and other components." (199 Ill. App. 3d at 1013, 557 N.E.2d at 1280.)

The court further found that the driver's consent was not negated by the presence of the defendant/owner as a passenger in the car. The defendant/owner had the power to delegate common authority over the car to the driver and to revoke it at any time. In *Harris*, the defendant remained silent and never expressed his ownership interest or evidenced a revocation of the driver's common authority. Furthermore, defendant/owner never refused consent to the search or objected to the driver's consent.

In *United States v. Morales* (3d Cir. 1988), 861 F.2d 396, 399, it was held that because the driver of a vehicle has immediate possession of and control over the vehicle, he also has general access to all areas of the vehicle. Accordingly, that driver may consent to a full search of the vehicle, including its trunk, glove box and other components. *Morales* further held that the silence of the passenger/owner

of the car is material in assessing the driver's authority to consent to the search. Thus, where the passenger/owner remains silent during the search, he is deemed to have impliedly consented to the search.

In *Morales*, it was found that the owner had no special privacy interest in the hidden area behind the rear seat where contraband was found other than that which he had in the car itself. Therefore, the driver had authority to consent even to a search of this hidden compartment. Neither the driver nor the owner had revoked or limited the scope of the consent in any way. The court held that the fact that certain compartments or their interiors are hidden from view is in and of itself immaterial. There is no separate privacy interest in a particular compartment simply because it is hidden from view. Of course, the court recognized that there may be a separate privacy interest in some area of the car where the driver's access and authority have been limited by the owner, as where the driver has not been given the key to the trunk or glove box. (*Morales*, 861 F.2d at 399; *Harris*, 199 Ill. App. 3d at 1013-14, 557 N.E.2d at 1280.) Such was not found to be the fact in either *Morales* or *Harris*.

■■ We think the instant case is very similar to both *Morales* and *Harris*. In the instant case, the driver of the car, Valencia, gave consent to search the car. There is no evidence that Valencia's consent was not voluntary. As driver of the car, Valencia had authority to consent to a search of the entire car, including its trunk, glove compartment, any hidden compartments and any other components of the car. There is no evidence that Valencia's authority over the car was limited in any way. Finally, defendant, who was present at all times, never objected to the search and never revoked or limited Valencia's authority or consent. We think that Valencia's consent to search the vehicle was sufficient to justify the search.

Because the trial court found, alternatively, that the search was illegal because it exceeded the scope of any consent, we must also address this issue, keeping in mind that the consent justifying the search was given by Valencia, rather than by defendant. The trial court found that the Spanish version of the written consent-to-search form authorized a search of the vehicle including the trunk and its contents. The court found, therefore, that

> "[s]ince the 'trunk' is a part of the vehicle, it is very likely that the defendant believed the scope of the search was to be the passenger compartment of the vehicle and the trunk as specified. As the testimony in this case bears, the search far exceeded this scope with the subsequent removal of the gas tank from the vehicle and the cutting open of said gas tank. ***

[T]his Court believes it unreasonable to believe that the defendant, by giving consent to search his vehicle including the trunk, agreed to the removal of his gas tank from the vehicle."

As we have said, the consent justifying the search here was given by the driver of the car, Valencia, and not the defendant. Valencia did understand written and spoken English, and therefore, although Valencia signed the Spanish version of the consent-to-search form, any finding as to the scope of the consent is not dependent on the Spanish version of the written consent form.

It is true that consent to search waives the warrant requirement only to the extent granted by that consent. Therefore, a consensual search is reasonable only if kept within the scope of the consent. (*People v. Porter* (1986), 141 Ill. App. 3d 71, 73, 489 N.E.2d 1154, 1156.) A consensual search should be conducted within the time limits and physical boundaries set by the consent. A consent to search which is unlimited as to time and number of searches must be judged under a rule of reason, that is, whether the search is reasonable. (*People v. Logsdon* (1991), 208 Ill. App. 3d 989, 993, 567 N.E.2d 746, 749.) What is reasonable is a factual determination to be made after considering all the circumstances under which the consent has been executed. *People v. Shelton* (1982), 110 Ill. App. 3d 625, 629, 442 N.E.2d 928, 932.

■ While consent to search may be limited to a specific place or item (*People v. Rodgers* (1981), 96 Ill. App. 3d 416, 418, 421 N.E.2d 203, 205), there is no evidence in the instant case that there was any limitation on the scope of the search. The written consent-to-search form signed by Valencia authorized a search of the vehicle, including the trunk and its contents. While the trial court found that it was unreasonable to conclude that this language included consent to remove and search the gas tank, it is uncontradicted that verbal consent to do exactly that was given by Valencia. Trooper Oliverio explained to Valencia that he wanted to take the car to a local service station to inspect the gas tank more closely. Oliverio explained that the car would be placed on a hoist and raised for this purpose. Although told that he was not obligated to consent, Valencia agreed to drive the vehicle to the service station for further search. Furthermore, neither Valencia nor defendant objected as they observed Oliverio begin to lower and remove the gas tank from the car. Consent to search may be implied from actions as well as expressly granted. (*Rodgers*, 96 Ill. App. 3d at 417, 421 N.E.2d at 205.) Valencia's act of voluntarily following the troopers to the service station and driving the vehicle onto the hoist, as well as his failure to object when the gas tank was lowered and

removed, certainly implies his consent to the search of the gas tank. Nor does the temporary interruption of the search in order to drive the car to the service station cause us any problem. See *People v. Manikowski* (1989), 186 Ill. App. 3d 1007, 542 N.E.2d 1148.

A trial court's determination as to whether consent to search was voluntarily given and, we think, the scope of that consent will be overturned where it is clearly unreasonable. (*People v. Krull* (1985), 107 Ill. 2d 107, 119, 481 N.E.2d 703, 709, *rev'd on other grounds* (1987), 480 U.S. 340, 94 L. Ed. 2d 364, 107 S. Ct. 1160.) We think the trial court's failure to find, on the facts before it, that Valencia validly and voluntarily consented to a search of the entire vehicle, including the inside of the gas tank, was clearly unreasonable.

On appeal, defendant argues that, regardless of whether there was valid consent to the search of the car and its gas tank, the decision of the trial court must be upheld because the initial stop of the car for a minor traffic violation was a mere pretext to detain defendant and search his car. Defendant correctly points out that if the ruling of the trial court is correct, even if premised upon different reasons from those which we find applicable, it will be sustained. (*People v. Gardner* (1977), 56 Ill. App. 3d 606, 609, 371 N.E.2d 1164, 1165.) However, we do not find the reason for affirmance advanced by defendant to be applicable here.

Defendant is correct that an officer's authority to investigate a traffic violation may not become a subterfuge to obtain other evidence based on suspicion. (*People v. Thomas* (1979), 75 Ill. App. 3d 491, 494, 394 N.E.2d 624, 627.) If the police make an arrest or detain a suspect as a pretext to conduct a search for which probable cause is lacking, the subsequent search is unconstitutional. (*United States v. Causey* (5th Cir. 1987), 818 F.2d 354, 359.) Where the purpose of a traffic stop is a pretext for a search or detention rather than for a traffic violation, such a search or detention is improper. *People v. Mathis* (1977), 55 Ill. App. 3d 680, 684, 371 N.E.2d 245, 249.

■ In determining whether a traffic stop is pretextual, it is now well settled that it is the objective reasonableness of the stop which must be examined, rather than the subjective motivation of the officer. If the stop is objectively reasonable, it is not invalidated solely because the officer acted out of an improper or dual motivation. (*People v. Perry* (1990), 204 Ill. App. 3d 782, 786, 562 N.E.2d 618, 621.) Thus, the proper inquiry is whether a reasonable officer would have made the stop in the absence of an illegitimate motive. *People v. Guerrieri* (1990), 194 Ill. App. 3d 497, 502, 551 N.E.2d 767, 770; *United States v. Smith* (11th Cir. 1986), 799 F.2d 704, 708.

Some Illinois courts have held that a stop will not be found to be pretextual where police officers do no more than what they are legally permitted to do, regardless of what their motives are. (*People v. Fickett* (1990), 204 Ill. App. 3d 220, 226, 562 N.E.2d 238, 241.) Thus, in *People v. Jones* (1990), 207 Ill. App. 3d 30, 565 N.E.2d 240, a cracked windshield was found sufficient to justify a stop as not pretextual where the Illinois Vehicle Code makes it unlawful to drive a vehicle with a windshield so defective as to materially impair the driver's vision. (Ill. Rev. Stat. 1989, ch. 95½, par. 12–503(e).) In *Guerrieri* (194 Ill. App. 3d at 502, 551 N.E.2d at 770), a stop for failure to signal a turn in violation of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 11–804) was found to be objectively reasonable because it is the primary statutory duty of Illinois State Police troopers to enforce the Illinois Vehicle Code. Ill. Rev. Stat. 1989, ch. 121, par. 307.16.

Defendant argues that Officer Sapp's stop of defendant's vehicle was pretextual because she had an improper motive in that her true purpose for stopping the car was to obtain consent to search it in hopes of finding evidence of a more serious crime. Defendant's car had Texas license plates, a known drug-source State, and the occupants were .Hispanic. Furthermore, given the very minor nature of the traffic violation involved here, it is highly unlikely that a reasonable officer would have stopped the defendant's vehicle without the hope that some other criminal activity might be discovered. Defendant argues that the objects hanging from the rearview mirror could not have materially obstructed the driver's view and there is no evidence that the officers instructed Valencia to remove the items from the mirror before driving the car to the service station. However, there is no evidence that the officers did not instruct Valencia to remove the items from the mirror, and Valencia was issued a warning ticket for the offense.

■ We disagree with defendant's analysis of the evidence. Trooper Sapp testified that she stopped defendant's vehicle because of a material obstruction of the driver's view caused by fuzzy dice and other items hanging from the rearview mirror. She was quite adamant that, in her opinion, the items would have materially obstructed the driver's view in some directions. She had viewed the hanging objects from her vehicle while following defendant's vehicle. Trooper Sapp had made numerous such vehicle stops and had issued a ticket for the same offense only 1½ weeks prior to hearing in the instant case. She issued Valencia a warning ticket for driving while his view was materially obstructed. She did not decide to ask consent to search

the vehicle until after she had stopped the vehicle, and did not radio for assistance from other officers until after she had obtained verbal consent to search from Valencia.

We think Trooper Sapp's stop of defendant's vehicle was objectively reasonable. Sapp believed that the driver of defendant's vehicle was in violation of the Illinois Vehicle Code. The trial court made an express factual finding that Sapp's stop of defendant's vehicle was justified by the alleged violation. We do not think this finding is manifestly erroneous or against the manifest weight of the evidence. Findings of fact of the trial court are not to be disturbed unless against the manifest weight of the evidence. *People v. Thomas* (1979), 75 Ill. App. 3d 491, 493, 394 N.E.2d 624, 627.

In summary, we find that Valencia had authority to, and gave, voluntary and valid consent to search defendant's vehicle, and the scope of that consent included consent to remove and search the gas tank of the vehicle. We further find that the initial stop of defendant's vehicle for violation of the Illinois Vehicle Code was not a pretext to search but was a valid stop. Accordingly, we reverse the order of the circuit court of Effingham County suppressing evidence found in the search of defendant's vehicle and remand this cause for further proceedings.

Reversed and remanded.

GOLDENHERSH, P.J., and HARRISON, J., concur.