THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JAMES A. SCHMITT, Defendant-Appellee.

Fourth District   No. 4—03—0445

Opinion filed March 30, 2004.

Scott Rueter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Charles F. Mansfield, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Steven Skelton, of Steven Skelton, P.C., of Bloomington, for appellee.

JUSTICE APPLETON delivered the opinion of the court:

The State charged defendant, James A. Schmitt, with various drug offenses, but the trial court granted in part his motion to quash his arrest and suppress the evidence against him. Having filed a certificate of impairment, the State appeals, arguing the police had probable cause to stop and search the truck Schmitt was driving. Because we agree with the State, we reverse the quashing of Schmitt's arrest and the suppression of evidence, and we remand this case for further proceedings.

## I. BACKGROUND

Early in the afternoon on August 13, 2002, Mike Cottrell, a loss-prevention manager at Wal-Mart in Decatur, called the Macon County sheriff's department and reported that a blond, curly-haired man, clad in a gray T-shirt, had just bought two boxes of pseudoephedrine. The man was later identified as Chad A. Hinthorne. When the police arrived, Hinthorne had already departed. He had met two other men outside the store, and the three headed south on State Highway No. 51 in a red Ford pickup truck with black ladder racks and license-plate number 1454 KR. The two other men were later identified as Schmitt and Gary Garland. Schmitt was the driver, although the truck was

registered to Hinthorne at an address in El Paso, in Woodford County, some 67 miles north of Decatur.

Soon afterward, a police officer spotted the truck on State Highway No. 48 and followed it to a business called "The Shop," which specialized in the sale of drug paraphernalia. All three occupants of the truck went into The Shop, and when they reemerged, one of them put something into the truck's toolbox, apparently a purchase.

The truck then went to Fairview Plaza Shopping Center, and the three got out and entered Ma Belle's Family Restaurant. Shortly afterward, Hinthorne came out of the restaurant and walked to a Dollar General store nearby. A police officer followed him into the store and watched him buy two more boxes of pseudoephedrine. After carrying the two boxes to the truck and stashing them in the toolbox, Hinthorne returned to the restaurant.

From the restaurant, the trio went north on State Highway No. 48 (with an undercover police officer following) and stopped at another Dollar General store. This time Schmitt entered the store, and a police officer followed him and watched him buy two boxes of pseudoephedrine.

Thus, within two hours, Hinthorne and Schmitt had bought a total of six boxes of pseudoephedrine. Each box had 20 pills. If one continuously took the maximum dosage—2 pills every 6 hours—one box would have been roughly a $2^1/_2$-day supply for one person.

Because of the multiple purchases of pseudoephedrine, the police pulled the pickup truck over and questioned Hinthorne, Schmitt, and Garland on the side of the highway.

At the hearing on the motion to suppress, the prosecutor asked one of the police officers, James Root:

"A. In fact, did you later run, did you run a check on Mr. Hinthorne, a warrants, Mr. Garland a warrants check?

Q. Yes. Mr. Garland was wanted."

A search of the truck revealed not only the six boxes of pseudoephedrine but also four lithium batteries in the glove box and a container of acetone behind the driver's seat. The police had no warrant, and neither the owner of the truck, Hinthorne, nor the driver, Schmitt, had consented to the search.

Later, in an interview at the police station, Garland divulged that methamphetamine was hidden under the ashtray of the truck. After obtaining a search warrant, the police searched the truck a second time and found the methamphetamine under the ashtray. They also searched Hinthorne's house in El Paso and found over 1,000 grams of methamphetamine "in various stages of the cooking process."

The trial court held as follows: (1) the police had "an articulable

suspicion adequate to justify the investigatory stop of the truck"; (2) the police "did not have probable cause to arrest the vehicle's occupants prior to locating the pills, batteries[,] and acetone during the initial search of the truck"; (3) the police "did not have permission to search the truck from anyone with authority"; (4) the police "did not have probable cause to conduct the initial search of the truck"; and (5) insufficient evidence was "presented for the court to determine whether the subsequent searches of the truck and [Hinthorne's] home were proper." Therefore, the court quashed Schmitt's arrest; suppressed the pseudoephedrine, lithium batteries, and acetone found in the truck; and also suppressed Schmitt's postarrest statements. The court declined, however, to suppress any statements Schmitt made "during the initial investigation stage of the stop."

This appeal followed.

## II. ANALYSIS

### A. Standard of Review

■ We will give great deference to the trial court's factual findings, reversing them only if they are against the manifest weight of the evidence (*People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078, 1083 (2001))—that is, only if all reasonable and unbiased persons would agree the evidence clearly points to the opposite finding (*People v. Miles*, 343 Ill. App. 3d 1026, 1030, 798 N.E.2d 1279, 1283 (2003)). We will review *de novo* the ultimate question of whether the seizure and search were constitutional. *Sorenson*, 196 Ill. 2d at 431, 752 N.E.2d at 1083.

### B. Inevitable-Discovery Rule

■ The trial court held the police had a reasonable, articulable suspicion of criminal activity and, therefore, a justification for a brief investigatory stop. See *Illinois v. Wardlow*, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 675 (2000). Notwithstanding their right to stop the truck and question the occupants about the pseudoephedrine, the police could not legally search the truck unless they had probable cause to believe it contained contraband (see *People v. Penny*, 188 Ill. App. 3d 499, 502, 544 N.E.2d 1015, 1016 (1989); *People v. Clark*, 92 Ill. 2d 96, 99, 440 N.E.2d 869, 871 (1982)) or evidence of a crime (see *People v. James*, 163 Ill. 2d 302, 312, 645 N.E.2d 195, 200 (1994)). Probable cause is a more rigorous standard than reasonable, articulable suspicion. *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989). The court held the police lacked probable cause.

■ The State invoked the inevitable-discovery rule. Under that

rule, "evidence that otherwise would be inadmissible may be admitted if the prosecution can show that the evidence ' "would inevitably have been discovered without reference to the police error or misconduct." ' " *People v. Mitchell*, 189 Ill. 2d 312, 342, 727 N.E.2d 254, 272 (2000), quoting *People v. Edwards*, 144 Ill. 2d 108, 142, 579 N.E.2d 336, 349 (1991), quoting *Nix v. Williams*, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511 (1984). The State argues that even if, as the trial court held, the search of the pickup was unsupported by probable cause, the police would have inevitably discovered the lithium batteries and acetone anyway because Garland was wanted on a warrant and upon lawfully arresting the occupant of a vehicle, the police may search the passenger compartment of that vehicle as well as containers within the passenger compartment. See *People v. Allibalogun*, 312 Ill. App. 3d 515, 519, 727 N.E.2d 633, 637 (2000).

■ Whether the police would have inevitably discovered the batteries and acetone as a result of the outstanding warrant on Garland depends on (1) whether they would have inevitably performed a warrant check on Garland at the scene of the stop, considering that he himself had bought no pseudoephedrine, and (2) whether, having learned of the warrant, they would have inevitably searched the truck as an incident of arresting Garland. As Root admitted on the stand, the police wanted all along to search the truck. They probably would not have knowingly passed by a legal opportunity to so. Therefore, the answer to (2) is probably yes. The answer to (1), however, is uncertain. Clearly, the police did, at some point in time, perform a warrant check on Garland, but the record does not seem to reveal when and why they did so. If they performed the warrant check on him only because of their discovery of the batteries and acetone in the truck, the warrant check probably was not inevitable in the sense that they would have performed it anyway.

In any event, the inevitability of the discovery of the batteries and acetone was a question of fact. At the conclusion of the hearing on the motion to suppress, the prosecutor argued "the police could have searched the interior of that [truck] based on the fact that there was a warrant out for Mr. Garland." Although the trial court never mentioned the inevitable-discovery rule in its factual findings, it apparently disagreed with the prosecutor's argument, and we will defer to the trial court in that factual determination. See *Sorenson*, 196 Ill. 2d at 431, 752 N.E.2d at 1083.

## C. Probable Cause

■ A police officer has probable cause to search a vehicle if the totality of circumstances known to the officer at the time of the search,

in light of the officer's law-enforcement experience, would justify a reasonable person in believing the vehicle contained contraband (*People v. Smith*, 95 Ill. 2d 412, 419, 447 N.E.2d 809, 811-12 (1983)) or evidence of a crime (*James*, 163 Ill. 2d at 312, 645 N.E.2d at 200).

Pseudoephedrine is derivative contraband if one possesses it to manufacture methamphetamine. 720 ILCS 570/401, 102(z—1) (West 2002); see *People v. Steskal*, 55 Ill. 2d 157, 159, 302 N.E.2d 321, 323 (1973) (defining "derivative contraband" as property "not inherently illegal" that is "used in an unlawful manner"); Black's Law Dictionary 318 (7th ed. 1999) (defining "derivative contraband" as "[p]roperty whose possession becomes unlawful when it is used in committing an illegal act"). Given the totality of the circumstances known to them at the time of the search, in light of their experience investigating the manufacture of methamphetamine, did the police reasonably believe the truck contained contraband?

The emphasis should fall on "the totality of the circumstances," the complete picture. Any one feature of the picture, by itself, might appear innocuous, but when a police officer stands back and regards the whole picture with a trained eye, he or she might recognize probable criminal activity. As the name suggests, "probable cause" requires only a "probability or substantial chance of criminal activity," not a certainty. *Illinois v. Gates*, 462 U.S. 213, 244 n.13, 76 L. Ed. 2d 527, 552 n.13, 103 S. Ct. 2317, 2335 n.13 (1983). "By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause." *Gates*, 426 U.S. at 244 n.13, 76 L. Ed. 2d at 552 n.13, 103 S. Ct. at 2335 n.13. "In making a determination of probable cause[,] the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Gates*, 462 U.S. at 244 n.13, 76 L. Ed. 2d at 552 n.13, 103 S. Ct. at 2335 n.13.

■ Within a space of two hours, Hinthorne, 67 miles from home, bought two boxes of pseudoephedrine at Wal-Mart and two more boxes at Dollar General. Except for a T-shirt that he bought at Wal-Mart, he apparently bought nothing else at those stores. Root observed: "The fact that they [*sic*] are going in to buy just pseudoephedrine pills at [Wal-mart] is a little significant. When I go shopping for pseudoephedrine pills, I buy two boxes of pseudoephedrine pills and a hundred dollars worth of groceries." Another occupant of the truck, Schmitt, bought two more boxes of pseudoephedrine at a separate Dollar General store. Root testified that in his experience as a member of the Illinois State Police Drug Task Force, manufacturers of methamphetamine had a *modus operandi*: they made separate purchases of pseudoephedrine at separate stores by separate buyers in an attempt to

minimize suspicion while maximizing the total amount of pseudo-ephedrine they could safely purchase. Further, if they lived in a small town, they made the purchases far away from home where they would likely not be recognized. That the three occupants of the truck also visited a "head shop" tended to strengthen the inference that they were involved in illegal drugs.

Given the totality of the circumstances, a reasonable person would conclude that Hinthorne and Schmitt bought the pseudoephedrine probably not for a legitimate purpose but for the manufacture of methamphetamine and there was a substantial chance the truck contained contraband or evidence of the manufacture of methamphetamine. Postulating innocent explanations does not necessarily defeat probable cause.

## III. CONCLUSION

For the foregoing reasons, we reverse the quashing of Schmitt's arrest and the suppression of evidence, and we remand this case for further proceedings not inconsistent with this opinion.

Reversed and remanded.

STEIGMANN and McCULLOUGH, JJ., concur.