2025 IL App (4th) 241230

NO. 4-24-1230

FILED
May 1, 2025
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| LURII IVANCHUK, | ) | No. 22CF223 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Johnathan C. Wright, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Zenoff and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1    In July 2024, the trial court convicted defendant, Lurii Ivanchuk, of unlawful

cannabis trafficking (720 ILCS 550/5.1(a) (West 2022)), in connection with the discovery of

cannabis found in a commercial moving truck defendant was driving. A state trooper initially

stopped defendant to conduct an inspection under the Illinois Motor Carrier Safety Law (Safety

Law) (625 ILCS 5/18b-100 *et seq.* (West 2022)) and the Illinois Department of Transportation's

motor carrier safety regulations (Safety Regulations) (92 Ill. Adm. Code 390). Neither defendant

nor his passenger and codefendant, Karp Grigoryan, spoke English well and used their phones as

translation devices. After the trooper became suspicious of criminal activity based on

irregularities in the paperwork and circumstances pertaining to the truck, he asked for consent to

search the truck, which was given by defendant's passenger. Upon seeing boxes with different

colored tape in the truck, which the trooper believed could indicate contraband marked for

different destinations, the trooper asked defendant to relocate the truck a short distance to be scanned by an X-ray. The X-ray showed boxes in the truck containing individual packages. A subsequent search of those boxes revealed a large amount of cannabis.

¶ 2        Before trial, defendant moved to suppress the discovery of the cannabis, contending the trooper's stop, subsequent searches, X-ray of the truck, and search of the boxes inside of the truck violated his fourth amendment right to be protected from unreasonable searches and seizures. The trial court denied the motion and found defendant guilty after a bench trial.

¶ 3        On appeal, defendant contends (1) the trooper lacked a reasonable suspicion to stop him, (2) the trooper unduly prolonged the stop to conduct a safety inspection, (3) the trooper unduly prolonged the stop beyond performance of the safety inspection or improperly sought consent to search because he lacked reasonable suspicion a crime was committed, (4) defendant did not give a knowing and voluntary consent to search, (5) the search exceeded the scope of any consent and the trooper lacked reasonable suspicion to convert the stop into an investigatory detention to scan the truck with an X-ray, (6) the trooper lacked probable cause to search boxes in the truck, and (7) the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        In December 2022, the State charged defendant with unlawful cannabis trafficking, unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(g) (West 2022)), and unlawful possession of cannabis (720 ILCS 550/4(g) (West 2022)). Cannabis was seized from the commercial truck defendant was driving after a state trooper stopped the truck and later relocated it a short distance to be scanned by an X-ray device, where cannabis was found inside of boxes in the truck.

¶ 6                                    A. Pretrial Motion to Suppress

¶ 7             Before trial, the defendant moved to suppress the warrantless search of the truck defendant was driving. He alleged (1) the state trooper who stopped him lacked reasonable suspicion for the stop in the absence of a traffic violation, (2) the trooper unreasonably prolonged the stop, (3) the trooper lacked reasonable suspicion to convert the stop into an investigatory detention, (4) defendant did not knowingly and voluntarily consent to the search, and (5) the search exceeded the scope of any consent. Defendant attached a transcript of his preliminary hearing to the motion.

¶ 8             Bryce Heaton, an Illinois State Police Trooper, testified he stopped a white box truck with California plates on Interstate 55 on December 12, 2022, in order to conduct a federal motor carrier safety inspection. In a written report, Heaton wrote he observed the truck switch lanes from the center lane to the far right lane for no apparent reason and also observed a passenger in the truck, which was not common in the trucking industry.

¶ 9             Heaton testified a motor carrier inspection is done to ensure federal motor carriers are complying with federal law and safety standards. Heaton had a level-three certification for inspections, which certified him to inspect the driver, driver's license, medical card, logs, and supporting documents, which included the bill of lading. It did not allow him to go inside of the vehicle. Heaton also testified he had attended numerous classes pertaining to contraband, including interdicting contraband from traveling on the interstate and training specific to commercial vehicles and narcotics, trafficking, money laundering, and cargo theft. Heaton testified it typically took 15 to 20 minutes to complete an inspection if everything was in order. From about 10:09 a.m. to 10:30 a.m., Heaton conducted the inspection.

¶ 10            Defendant was driving the truck, and his codefendant, Grigoryan, was a

passenger. Heaton asked defendant for documents related to the inspection and ordered him to sit in Heaton's squad car. Heaton said both men appeared nervous and were trembling and shaking. Heaton initially said both defendant and Grigoryan had commercial driver's licenses, which require the holder to be proficient in English. He later corrected that statement and said they had Class C licenses, which did not have that requirement. However, a national database listed defendant as having a commercial license. Heaton testified defendant spoke virtually no English. However, defendant and Grigoryan were able to answer his questions, tell him where they came from, where they were going, and what they were hauling. He also said defendant would sometimes speak in English and sometimes not. Heaton stated he had to ask defendant to come to his vehicle more than two or three times but also stated that was pretty common because it was loud on the road. Defendant came to Heaton's vehicle and sat down. Heaton said defendant was "fidgety" and breathing heavily.

¶ 11 Defendant asked for Grigoryan to translate, and Grigoryan then came to the vehicle and started answering questions for defendant. Heaton agreed Grigoryan's English "was not particularly good." However, Grigoryan answered questions. Heaton felt Grigoryan was providing answers for defendant as if Grigoryan was in charge.

¶ 12 Videos of Heaton's encounter with defendant and Grigoryan were introduced into evidence. Portions of the videos showed defendant answering "yes" to basic questions such as whether Grigoryan was a codriver. The videos also showed the men providing the documents Heaton requested and repeating the name of the documents. Grigoryan could be heard saying defendant's English was not good and asking if he could help defendant.

¶ 13 The videos from Heaton's squad car showed when Heaton asked defendant what he was hauling, defendant said "maybe uh my friend uh translator." Grigoryan then answered

questions, telling Heaton they were hauling household goods, had come from Los Angeles, and were driving to Chicago. Grigoryan appeared to understand the questions and responded appropriately. Heaton asked if Grigoryan was the owner of the moving company. Grigoryan told Heaton he was just a driver. He said he did not know how many trucks the company had and that it was maybe two or three. He also told Heaton he did not load the truck. He said "other guys" loaded the truck from storage. At times, Heaton had to ask questions more than once. Heaton asked defendant when the men picked up the load, and defendant asked to translate using his phone. He then told Heaton the load was picked up on December 10.

¶ 14     Heaton testified he had reasonable suspicion there was criminal activity taking place after he viewed defendant's paperwork. Heaton testified the bill of lading, which lists what is being transported, was handwritten and dated for two months prior, which was out of the industry norm. He said, "Generally, almost 100 percent of the time," a bill of lading is recent, within a few days. In addition, defendant and Grigoryan initially said they picked up the items in the truck from a residence, which matched the address in the bill of lading, but then changed that to a storage facility when questioned about the bill of lading being two months old. The destination was also a storage facility. Heaton said it was uncommon to transport items across the country from one storage facility to another storage facility. It was also uncommon for there to be a passenger in the truck. At the preliminary hearing, Heaton also testified it was unusual for a truck to be padlocked.

¶ 15     At about 10:30 a.m., the inspection ended, but Heaton considered the men to be under a criminal investigation. Heaton asked defendant for consent to search the vehicle, which Grigoryan also heard. During his testimony, Heaton said defendant appeared to be confused but Grigoryan agreed to the search, and he asked both men to consent and they said "yes." Heaton

told Grigoryan to get the key to the back of the truck and unlock it, and Grigoryan complied. Heaton did not tell the men they had the option of saying no to the request to search the vehicle. He did not obtain written consent and stated doing so was not Illinois State Police policy.

¶ 16 The videos showed Heaton asked if there was anything illegal in the truck, and one of the men said "no." He also asked if there were drugs in the truck and if the men watched the truck being loaded or knew what was in there. Grigoryan said something about "see" and "the load," and Heaton asked, "can I search the load?" Grigoryan then said, "You see?" while nodding toward the truck. Heaton asked again, "can I search it?" Grigoryan responded "yeah" while again nodding his head toward the truck. Heaton told Grigoryan to get the key, and Grigoryan left to do so.

¶ 17 Heaton looked in the back of the truck and saw "a bunch of furniture and stuff," but no contraband. Heaton described the back of the truck as "messy," which was also outside of the industry norm. A video showed a box at the back of the truck with "bathroom" written on it. However, looking between items in the back of the truck, Heaton saw boxes toward the front of the truck labeled with colored tape, which Heaton found unusual because usually moving boxes would be labeled with writing on the box regarding rooms the items belonged to. The boxes also did not match the bill of lading. Heaton had seen previous cases where colored tape corresponded to multiple stops or different cities that contraband might be delivered to. Heaton testified it would be unsafe to unload the truck to further search it at its location on the side of the interstate highway.

¶ 18 Another trooper joined Heaton while the back of the truck was open. A video showed Heaton telling the trooper the men said the items in the truck had been in storage for two months and said "good luck translating to these guys though." The trooper noted the truck had

been "around Las Vegas," then to Albuquerque, "then back to New Gallup, like its [*sic*] all over the place." Using a translating device, Heaton instructed defendant and Grigoryan to follow the trooper to a location less than a mile away to X-ray the vehicle. Heaton told the men they were going to run the truck through the X-ray just to make sure there was nothing illegal in it. Grigoryan indicated he understood, and the men complied.

¶ 19        At the preliminary hearing, Heaton testified that, when the truck was scanned with the X-ray it showed boxes in the front of the truck had individual packages in them, which, based on previous scans he had seen, he believed could contain contraband. A video showed Heaton discussing results of the scan with other law enforcement officers, who noted discrepancies with the bill of lading. Heaton mentioned something that looked like "fruit or something," and another officer mentioned "tight packages of cocaine or weed" and "individual packages," but he also stated "I don't know." Heaton then pointed to items on the screen that appeared to be individually packaged. An officer also pointed at something in the cab of the truck.

¶ 20        Heaton searched the cab of the truck and did not find cannabis. However, Heaton said he smelled the odor of cannabis in the cab of the truck. At the preliminary hearing, he described the odor as "raw" cannabis. He did not smell cannabis during the initial stop, when he opened the truck for the first time at the side of the highway, or on either defendant or Grigoryan. He also found $2,000 to $3,000 in United States currency held with a rubber band. Grigoryan told him it was money for fuel, which Heaton found unusual since most trucking companies used fuel cards or credit cards to purchase fuel. Papers were found in the truck that appeared to be handwritten notes from a person who was working on learning English.

¶ 21        When Heaton opened the back of the truck again, he smelled cannabis. At about 11:01 a.m., Heaton began to unload items from the back of the truck. At about 11:40 a.m.,

Heaton found cannabis in boxes labeled with colored tape. At the preliminary hearing, Heaton testified 4,360 pounds of cannabis was found in the truck.

¶ 22 The trial court found the stop was lawful based on the Safety Regulations, which allowed the state police to stop and inspect any commercial vehicle at any time to determine its compliance with the Safety Law. The court next found Grigoryan voluntarily gave consent to search the truck. The court noted Heaton was not required to tell the men they could refuse the search and he did not coerce Grigoryan into consenting. The court found Grigoryan had sufficient knowledge of English to consent and noted the video clip where Grigoryan consented, finding it showed he had a working knowledge of English and further noted the men used their phones to aid in translation. The court then found Grigoryan's consent did not expire just because the truck was moved, because a search on the side of the road was impractical, and the move was a continuation of the first search. It also found Heaton did not exceed the scope of the consent. The court found the search was not unlawfully prolonged where the time for the inspection was reasonable and its extension was based on reasonable suspicion. The court also found, when the boxes with colored tape were found, combined with the currency found in the truck, Heaton then had probable cause to search the boxes. Accordingly, the court denied the motion to suppress.

¶ 23 B. Trial

¶ 24 On June 13, 2024, a stipulated bench trial was held. Defendant stipulated Heaton would testify consistently with his testimony at the preliminary hearing and the hearing on the motion to suppress. Although inconsistent with earlier testimony, he further stipulated Heaton would testify he smelled cannabis both while roadside and when he opened the truck after it was relocated. The exhibits provided at the hearing on the motion to suppress, including Heaton's

written report, were introduced into evidence. That report was generally consistent with Heaton's testimony at the hearing on the motion to suppress. In the report, Heaton noted the United States currency found in the truck and opined it was payment for delivery of cannabis. He also noted the boxes in the truck with colored tape and that vacuum packed bags of cannabis were found in the truck. Another exhibit showed the truck contained more cannabis than was included in the charges. The stipulation provided for 6,339 grams of cannabis.

¶ 25        Other exhibits showed the truck's license plates were used by two different moving companies. Consumer complaints against one of the companies stated it took months for the company to deliver household goods and items would be missing or damaged. A report by an investigator opined there was a good possibility the business was using contracts as cover to transport contraband from location to location and then deliver the goods months later. The investigator further opined there was a good possibility the contracts were duplicated to utilize other trucks and some of the contracts were fake. License plate readers showed the truck had been to many locations, including stops in New Mexico, Texas, New York, Indiana, Iowa, and Nevada over the two months before the stop, including multiple stops in Illinois, without dropping off the household goods. It had also driven more miles than was average in the industry. The truck had not shown up on license plate readers in California during the relevant time period. "Anna Wintour" was listed as the owner of the household goods in the truck, but that person had a disconnected phone number. The bill of lading did not list a unit number for the storage facility listed as the truck's destination, and that storage facility could not find any records for Anna Wintour. Phone numbers for the moving companies were also disconnected.

¶ 26        Defendant argued he was not aware of cannabis in the truck and suggested he had been taken advantage of by the people who loaded the truck. The State argued there was strong

circumstantial evidence defendant knew the truck contained cannabis.

¶ 27     The trial court found defendant guilty on all counts. Defendant moved for a new trial, arguing the court erred in denying the motion to suppress and the evidence was insufficient to prove him guilty beyond a reasonable doubt. The court denied defendant's motion. The court merged the convictions and sentenced defendant to 13 years imprisonment on the trafficking charge.

¶ 28     This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30     On appeal, defendant contends (1) the trial court erred by denying his motion to suppress and (2) the State failed to prove him guilty beyond a reasonable doubt.

¶ 31                              A. Motion to Suppress

¶ 32     Defendant contends the trial court erred by denying his motion to suppress because (1) Heaton lacked a reasonable suspicion to stop him in the absence of a traffic violation, (2) Heaton unreasonably prolonged the stop to conduct the safety inspection, (3) Heaton unduly prolonged the stop beyond performance of the safety inspection or improperly sought consent to search because he lacked reasonable suspicion a crime was committed, (4) defendant did not give a knowing and voluntary consent to the search, (5) the search exceeded the scope of any consent and Heaton lacked reasonable suspicion to convert the stop into an investigatory detention to scan the truck with an X-ray, and (6) Heaton lacked probable cause to search boxes in the truck.

¶ 33     "Both the fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 protect individuals from unreasonable searches and seizures." *People v. Bujari*, 2020 IL App (3d) 190028, ¶ 37 (citing U.S. Const., amend. IV, and

citing Ill. Const. 1970, art. I, § 6). "The fundamental purpose of these provisions is to safeguard the privacy and security of individuals from invasions by governmental officials." *Bujari*, 2020 IL App (3d) 190028, ¶ 37. On a motion to suppress evidence, the defendant has the burden of producing evidence and proving the search and seizure were unlawful, but once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden then shifts to the State to produce evidence justifying the intrusion. *People v. Woodrome*, 2013 IL App (4th) 130142, ¶ 16.

¶ 34 When reviewing a ruling on a motion to suppress, we are presented with mixed questions of fact and law. *People v. Manzo*, 2018 IL 122761, ¶ 25. We will give deference to a trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence. *Manzo*, 2018 IL 122761, ¶ 25. Where the factual findings are accepted, we will conduct a *de novo* review of whether suppression is warranted under those facts. *Manzo*, 2018 IL 122761, ¶ 25.

¶ 35                                    1. *The Stop*

¶ 36 Defendant first argues Heaton lacked reasonable suspicion to stop the truck. However, defendant focuses solely on the lack of evidence of a traffic violation to provide reasonable suspicion for the stop and ignores the trial court's determination Heaton reasonably stopped defendant to conduct an authorized inspection under the Safety Law and Safety Regulations. Under the court's reasoning, reasonable suspicion of a traffic violation was not necessary, because the stop was reasonable for fourth amendment purposes when made under the Safety Regulations.

¶ 37 "The temporary detention of an individual during a vehicle stop is a seizure within the meaning of the fourth amendment." *People v. Johnson*, 2024 IL App (4th) 231185,

¶ 53. Such seizures, commonly referred to as *Terry* stops, are analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Johnson*, 2024 IL App (4th) 231185, ¶ 53. " 'Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop of a person when the officer reasonably believes that the person has committed, or is about to commit, a crime.' " *Johnson*, 2024 IL App (4th) 231185, ¶ 53 (quoting *People v. Timmsen*, 2016 IL 118181, ¶ 9).

¶ 38      Regulations promulgated in accordance with the Safety Law (625 ILCS 5/18b-100 *et seq.*) (West 2022)) authorize the Illinois state police to enter upon and perform commercial vehicle inspections of motor carrier vehicles in operation. 92 Ill. Adm. Code 396.2010 (2013). A level 3 inspection is defined as follows:

> "Level 3 - Driver/Credential Inspection: An examination that includes those items specified under the North American Standard Level 3 Driver/Credential Inspection Procedure. At a minimum, Level 3 inspections must include, when required and/or applicable, examination of the driver's license; medical examiner's certificate and Skill Performance Evaluation (SPE) Certificate; driver's record of duty status; hours of service; seat belt; vehicle inspection report; and [hazardous material/dangerous goods] requirements. Those items not indicated in the North American Standard Level 3 Driver/Credential Inspection Procedure shall not be included on a Level 3 inspection." 92 Ill. Adm. Code 390.1020 (2016).

¶ 39      The Safety Regulations serve the same objective as enforcement of the traffic code by ensuring commercial vehicles on the road are operated safely and responsibly. *Bujari*, 2020 IL App (3d) 190028, ¶ 43. In light of the diminished expectation of privacy in commercial property used in closely regulated industries, the requirements fulfilling the traditional fourth amendment standard of reasonableness for a government search have lessened application in that

context. *Bujari*, 2020 IL App 3d 190028, ¶ 42.

¶ 40        Here, the trial court determined the stop was reasonable and valid because it was done to conduct an administrative inspection. Thus, reasonable suspicion of a traffic violation was not required. Defendant did not challenge that legal determination in the trial court, choosing instead to focus solely on the lack of a traffic violation. Then, on appeal, defendant again does not address the applicability of the Safety Law and Safety Regulations or the court's finding that Heaton validly stopped the truck to complete a level-three inspection.

¶ 41        We note the question of whether a search under such regulations is valid in the absence of suspicion of a violation of the regulations or without certain limits is a complex legal issue. Generally, the warrantless inspection of a pervasively regulated business will be deemed reasonable under the fourth amendment when (1) there is a substantial governmental interest underlying the regulatory scheme pursuant to which the inspection is made, (2) the warrantless search is necessary to further that regulatory scheme, and (3) the inspection program provides an adequate substitute for a warrant by advising the owner of the commercial property that the property will be subject to periodic inspections undertaken for specific purposes and limiting the discretion of the inspectors in time, place, and scope. *59th & State Street Corp. v. Emanuel*, 2016 IL App (1st) 153098, ¶ 19 (citing *New York v. Burger*, 482 U.S. 691, 702-03 (1987)). We further note it appears Illinois courts have not specifically addressed the issue, and courts in other jurisdictions have differed in their determinations as to whether similar regulatory schemes permitting inspections of commercial vehicles satisfies that test in similar cases. Compare *State v. McClure*, 74 S.W.3d 362, 372-76 (Tenn. Crim. App. 2001) (affirming the grant of the defendant's motion to suppress because regulations did not sufficiently limit the time, place, and scope of inspections), with *Commonwealth v. Leboeuf*, 934 N.E.2d 1285, 1289-90 (Mass. App.

Ct. 2010) (stating regulations authoring safety inspections were an adequate substitute for a warrant and a random stop of a commercial vehicle for purposes of conducting an administrative safety inspection was not unreasonable under the fourth amendment).

¶ 42 Because defendant has failed to develop any legal argument both in the trial court and on appeal to support a conclusion the regulations did not provide a valid reason for the stop, he has forfeited any argument to the contrary in multiple respects. First, defendant forfeited the issue by failing to raise the issue in the trial court. See *People v. Cruz*, 2013 IL 113399, ¶ 20 ("Generally, an issue not raised in the trial court is forfeited on appeal."). As such he failed to meet his burden of showing the stop was unlawful. In addition, by failing to raise arguments in the trial court, a defendant deprives the State of the opportunity to challenge the arguments or present evidence, if necessary, in opposition to the argument. See *People v. Pettis*, 2016 IL App (4th) 140469, ¶ 25 (citing *People v. Hughes*, 2015 IL 117242, ¶ 46). Failing to make arguments in the trial court also deprives a trial court of the opportunity to decide the issue based on the arguments and may further deprive the appellate court of an adequate record related to the argument. *Pettis*, 2016 IL App (4th) 140469, ¶ 25.

¶ 43 Next, defendant forfeited the issue by failing to address it on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). The failure to assert a well-reasoned argument supported by legal authority is a violation of Rule 341(h)(7) resulting in forfeiture. See *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009).

¶ 44 Here, even if Heaton did not separately have reasonable suspicion to stop the truck, reasonable suspicion of a traffic violation or crime was not required under the trial court's analysis of the issue. Since defendant forfeited his argument that the court erred in determining

- 14 -

the stop was reasonable under the fourth amendment based on application of the Safety Law and Safety Regulations, we find no error in the court's overall determination that the stop reasonable and valid under the fourth amendment.

¶ 45                                    2. *Length of the Stop*

¶ 46       Defendant next contends, even if the initial stop was valid, Heaton unlawfully prolonged the stop by asking questions about the contents of the truck and performing subsequent searches of it.

¶ 47       A traffic stop that is lawful at its inception may become unlawful if it is unduly prolonged. *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015). An officer may stop and briefly detain a motorist when legally permissible, but the officer may not prolong the stop beyond the time reasonably required to satisfy its initial purpose. See *People v. Drain*, 2023 IL App (4th) 210355, ¶ 43 (citing *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 52). The seizure's "mission" determines the permissible duration of a traffic stop—that is, to address the issue that warranted the stop. See *Drain*, 2023 IL App (4th) 210355, ¶ 43. "While an officer may conduct checks unrelated to the traffic stop's mission, the officer may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Drain*, 2023 IL App (4th) 210355, ¶ 43. "In determining whether a stop has been unreasonably prolonged, courts employ a contextual, totality of the circumstances approach that considers the brevity of the stop and whether the police acted diligently during that stop." *Drain*, 2023 IL App (4th) 210355, ¶ 43. "Courts also consider 'the nature of the offense and the ordinary inquiries incident to the stop.' " *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 41 (quoting *People v. Wofford*, 2012 IL App (5th) 100138, ¶ 27).

¶ 48       Here, the length of the stop for purposes of the inspection was just over 20

minutes. The record shows Heaton used that time to inspect the paperwork and ask related questions. Nothing shows Heaton delayed looking at the paperwork, and the time it took to complete the inspection was near the 15 to 20 minute range of time Heaton testified was typical for such an inspection.

¶ 49        Nevertheless, relying on *People v. Hall*, 351 Ill. App. 3d 501 (2004), and *People v. Moses*, 2023 IL App (5th) 210115-U, defendant suggests Heaton unreasonably delayed the inspection by asking repetitive and unnecessary questions unrelated to the stop. We find those cases distinguishable.

¶ 50        In *Hall*, officers stopped the defendant for a nonfunctioning headlight but then asked questions about contraband after the stop had ended and they had told the defendant he was free to leave. At the time of the questioning, the officers lacked reasonable suspicion the defendant had committed a crime and were merely conducting a "fishing expedition" that changed the fundamental nature of the stop. *Hall*, 351 Ill. App. 3d at 504-05. In *Moses*, an officer prolonged a traffic stop to give a warning ticket by asking questions and taking actions unrelated to the stop apparently for the purpose of delaying the detention until a second officer arrived, which would allow a dog sniff to be performed. However, the officer did not have reasonable suspicion that the defendant committed a crime. *Moses*, 2023 IL App (5th) 210115-U, ¶¶ 36-42.

¶ 51        Here, unlike in *Hall* and *Moses*, the record and videos show Heaton asked basic questions reasonably related the investigation, such as inquiring about the nature of the trucking company and defendant's role in the company, along with what was being hauled in the truck and where the truck had been. We do not find any of the questions unduly repetitive. We also do not find Heaton delayed in looking at the paperwork necessary to perform the inspection. Further, as we discuss next, unlike in *Hall* and *Moses*, during the inspection, Heaton obtained

reasonable suspicion a crime had occurred based on discrepancies in the inspection documents and other factors related to the stop. Thus, he obtained reasonable suspicion before the stop ended and before he inquired about contraband and asked for consent to search the truck. Thus, Heaton did not unreasonably prolong the inspection without reasonable suspicion during the time he conducted the inspection.

¶ 52                    3. *Reasonable Suspicion to Search or Seek Consent to Search*

¶ 53          Defendant next argues Heaton unreasonably delayed the stop for purposes of searching the truck or seeking consent to search without reasonable suspicion.

¶ 54          As previously noted, where a traffic stop is prolonged beyond its mission, additional fourth amendment justification is necessary for the prolonged stop to be lawful. *Rodriguez*, 575 U.S. at 350-51. A prolonged stop to perform a brief investigation into detecting evidence of ordinary criminal wrongdoing will be deemed lawful where it is supported by a reasonable suspicion of criminal activity. *Rodriguez*, 575 U.S. at 355.

¶ 55          The determination of whether an officer has reasonable suspicion requires consideration of the totality of the circumstances. *Timmsen*, 2016 IL 118181, ¶ 9. Although a reasonable, articulable suspicion is a less demanding standard than probable cause, an officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch criminal activity has occurred. *Timmsen*, 2016 IL 118181, ¶ 9. In evaluating the officer's conduct, "we apply an objective standard and consider, 'would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' " *Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 21-22). "In reviewing the propriety of an officer's conduct, courts cannot reasonably demand scientific certainty from law enforcement officers where none exists." *People v. Moore*, 341 Ill.

App. 3d 804, 810 (2003). "Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Moore*, 341 Ill. App. 3d at 810. Nervous behavior is also a pertinent factor in determining reasonable suspicion. *Moore*, 341 Ill. App. 3d at 811. However, it cannot be the only factor. See *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 78.

¶ 56        Here, the case quickly transitioned from a valid stop to complete a regulatory inspection to a separate criminal investigation when Heaton observed multiple irregularities among defendant's documents and the circumstances surrounding the stop. For example, the bill of lading was handwritten and dated for two months prior, which was out of the industry norm. Then, defendant and Grigoryan initially said they picked up the items in the truck from a residence, which matched the address in the bill of lading, but they changed that to a storage facility when questioned about the bill of lading being two months old. The destination was also a storage facility, which was unusual. It was also uncommon for there to be a passenger in the truck and for the truck to be padlocked. Heaton further found it was unusual Grigoryan was providing answers for defendant as if Grigoryan was in charge, and Heaton noted both men were nervous. Those factors were discovered in the course of the stop and gave Heaton reasonable suspicion the truck contained contraband because the unusual circumstances did not comport with the mere moving of household goods. See generally *United States v. Johnson*, 285 F.3d 744, 748-49 (8th Cir. 2002) (stating facts outside of the industry norm for commercial trucking are among relevant factors in determining officers had reasonable suspicion to continue to detain a defendant after an initial stop and inspection). Accordingly, before Heaton had ended the inspection, he had the requisite reasonable suspicion to prolong the stop to further that investigation by asking questions about contraband and requesting consent to search.

¶ 57                    4. *Consent to Search*

¶ 58          Defendant next argues the consent to search the truck was not knowing or

voluntary.

¶ 59          Searches conducted outside the judicial process, without a warrant, are

presumptively unreasonable. *People v. Burton*, 409 Ill. App. 3d 321, 328 (2011) (citing U.S.

Const., amend. IV, and citing Ill. Const.1970, art. I, § 6, and citing *Illinois v. Rodriguez*, 497

U.S. 177, 181 (1990)). However, "[a]n exception to the warrant requirement exists where law

enforcement officers obtain consent to the search from either the person whose property is being

searched or from a third party who possesses 'common authority' over the premises." *Burton*,

409 Ill. App. 3d at 328 (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). Thus, it is

well-settled an individual may consent to a search conducted without a warrant and thus

eliminate the need for probable cause and a search warrant. *Schneckloth v. Bustamonte*, 412 U.S.

218, 219 (1973); *People v. Phillips*, 264 Ill. App. 3d 213, 217 (1994). We note defendant does

not contest that Grigoryan had common authority over the truck and thus could consent to its

search.

¶ 60          A warning of the right to refuse to consent is not required prior to obtaining valid

consent. *Schneckloth*, 412 U.S. at 246; *Phillips*, 264 Ill. App. 3d at 217. To support a search

undertaken with consent, the State must prove by a preponderance of the evidence the consent

was voluntarily given. *Phillips*, 264 Ill. App. 3d at 217. "The determination of whether a consent

is voluntary is a question of fact to be determined from the totality of all the circumstances."

*Phillips*, 264 Ill. App. 3d at 217. The voluntariness of a consent does not depend on any single

factor and instead "depends upon all the circumstances under which the consent was given."

*Phillips*, 264 Ill. App. 3d at 217. "Accordingly, lack of knowledge of the right to refuse to

consent does not vitiate the voluntariness of the consent but is merely a factor to consider."

*Phillips*, 264 Ill. App. 3d at 217-18. A defendant may also consent to a search by nonverbal conduct. *People v. Banta*, 2021 IL App (4th) 180761, ¶ 29. However, mere acquiescence to authority is not necessarily consent. *Banta*, 2021 IL App (4th) 180761 ¶ 29. The question of the subject matter of the consent is factual and will not be disturbed unless the conclusion of the trial court is against the manifest weight of the evidence. *People v. Shelton*, 110 Ill. App. 3d 625, 628 (1982).

¶ 61　　　　　Here, defendant argues the consent to search was involuntary because neither he nor Grigoryan understood English. However, the record shows Grigoryan understood Heaton's request to search the truck. Video of the request showed Heaton asked if there was anything illegal in the truck and one of the men said, "no." He also asked if there were drugs in the truck and if the men watched the truck being loaded or knew what was in it. Grigoryan then said something about "see" and "the load," and Heaton asked, "can I search the load?" Grigoryan responded, "You see?" while nodding toward the truck. Heaton asked again "can I search it?" Grigoryan then responded "yeah," while again nodding his head toward the truck. Heaton told Grigoryan to get the key, and Grigoryan left to do so. The context of Grigoryan's verbal permission to search the truck coupled with his nods toward it and question "You see?" reasonably established he understood the request and consented to the search. Thus, the trial court's determination that the consent was voluntary was not against the manifest weight of the evidence.

¶ 62　　　　　　　　　　5. *Scope of the Consent to Search*

¶ 63　　　　　Defendant next argues, even if the consent was voluntary, Heaton exceeded the scope of the consent and again unduly prolonged the stop by relocating the truck. The State

argues the search was a single continuous search to which defendant consented, making the relocation reasonable.

¶ 64        "Although consenting to a search waives the warrant requirement, it does so only within the scope of the consent." *People v. Harrell*, 226 Ill. App. 3d 866, 873 (1992). "A consensual search should be conducted within the time limits and physical boundaries set by the consent." *People v. Mendoza*, 234 Ill. App. 3d 826, 836 (1992). "A consent to search which is unlimited as to time and number of searches must be judged under a rule of reason, that is, whether the search is reasonable." *Mendoza*, 234 Ill. App. 3d at 836. "What is reasonable is a factual determination to be made after considering all the circumstances under which the consent has been executed." *Mendoza*, 234 Ill. App. 3d at 836. Generally, a consent to search is given with the understanding the search will be conducted forthwith and only a single search will be made. *People v. Logsdon*, 208 Ill. App. 3d 989, 992 (1991). However, a brief interruption or a temporary suspension of a search does not transform one continuous search into two separate searches. *Logsdon*, 208 Ill. App. 3d at 992; see *People v. Manikowski*, 186 Ill. App. 3d 1007, 1012 (1989).

¶ 65        For example, in *Logsdon*, the defendant, who was hospitalized, asked the police to search her home because she was concerned her ex-husband, who had been harassing her, was planning to break into the home. *Logsdon*, 208 Ill. App. 3d at 991. In response, a police officer went to the defendant's home and found pry marks on the unlocked kitchen door and chipped wood next to the door. *Logsdon*, 208 Ill. App. 3d at 991. Upon entry, the officer searched each room and came upon a cubbyhole containing a clear plastic bag of what appeared to be cannabis. *Logsdon*, 208 Ill. App. 3d at 991. The officer left the bag where it was, completed his search for intruders, and returned to his squad car to call for backup to secure the residence while he went

to obtain a warrant. *Logsdon*, 208 Ill. App. 3d at 991. Backup arrived about 50 minutes later, and the officer then contacted an assistant state's attorney who advised him to reenter the premises and seize the drugs without a warrant, which he did. *Logsdon*, 208 Ill. App. 3d at 991.

¶ 66　　　　The trial court granted the defendant's motion to suppress, finding that although the officer's initial entry was with the homeowner's consent, he exceeded the scope of that consent when he reentered the home. *Logsdon*, 208 Ill. App. 3d at 992. However, the appellate court reversed, rejecting the notion there were two separate searches of the defendant's home. *Logsdon*, 208 Ill. App. 3d at 992-93. Instead, the court found there was one continuous search, and the brief interruption or temporary suspension of a search would not transform one continuous search into two separate searches. *Logsdon*, 208 Ill. App. 3d at 992. The court also specifically observed the officer never abandoned his investigation, relinquished control over the defendant's house, or indicated an intent not to seize the cannabis. Instead, he only briefly interrupted his search to call for backup and to reach the assistant state's attorney. *Logsdon*, 208 Ill. App. 3d at 992-93.

¶ 67　　　　Similarly, in *Manikowski*, a search was started at the side of a highway, suspended because of bad weather, and finished in a garage in a nearby town. *Manikowski*, 186 Ill. App. 3d at 1009-10. The appellate court held there were not two separate searches. Instead, there was one search, albeit interrupted. The object of the search never changed, only the location changed. *Manikowski*, 186 Ill. App. 3d at 1012. Meanwhile, the defendant never withdrew or limited consent. *Manikowski*, 186 Ill. App. 3d at 1012.

¶ 68　　　　Here, the men broadly gave consent for officers to search "the load." Then, Heaton told them the truck would be moved and run through an X-ray, and they complied. The act of voluntarily following officers to the second location implied consent for the continuation

of the search. Heaton had not completed his investigation when he looked in the back of the truck, and he never abandoned his investigation. See *Mendoza*, 234 Ill. App. 3d at 836-37 (stating the voluntary relocation of a vehicle contributed to implied consent and a temporary interruption in order to drive the vehicle there did not require new consent).

¶ 69    Defendant contends *People v. Pulido*, 2017 IL App (3d) 150215, requires a different conclusion. We disagree. There, officers asked the defendant if they could search his vehicle to make sure there was nothing illegal following a stop in which a dog performing a free-air sniff alerted to the driver's side door of the vehicle. *Pulido*, 2017 IL App (3d) 150215, ¶¶ 17-19. After the officers failed to find any contraband, the defendant and his vehicle were "transported" or "relocate[d]" to the police station and the vehicle was later searched again after the dog alerted to the back seat. *Pulido*, 2017 IL App (3d) 150215, ¶¶ 22-24. The appellate court held the defendant's consent to search was limited to the initial search at the side of the highway. In doing so, the court wrote,

> "we do not believe an Illinois citizen who is pulled over on a highway and subsequently consents to a search of his vehicle intends to voluntarily and knowingly consent to have his vehicle removed from the highway and relocated to the local police station for a further search once the initial search on the highway is completed." *Pulido*, 2017 IL App (3d) 150215, ¶ 57.

¶ 70    We find *Pulido* distinguishable. In *Pulido*, the initial search had been completed, finding nothing, before the vehicle was transported by the police to another location for a second search later, after a second dog sniff was performed. In contrast, here, the men agreed to follow the troopers a short distance to have the truck scanned by the X-ray to continue the initial uncompleted search. They were not separately or involuntarily transported elsewhere for a

second search or a search that occurred much later after additional inquiry. Thus, we find *Logsdon* and *Mankowski* applicable here and conclude the brief delay to run the truck through the X-ray was a continuation of the initial search, which was performed with consent. Further, trial court's finding the relocation and X-ray were not unduly delayed was not against the manifest weight of the evidence.

¶ 71                          6. *Search of the Boxes and Probable Cause*

¶ 72          Defendant next argues officers again unduly prolonged the search or exceeded the scope of consent when they searched the boxes inside of the truck and found the cannabis. He further argues the search went beyond defendant's authority as third party to consent to a search of boxes he did not own. The State argues Heaton had probable cause for the search, making consent irrelevant.

¶ 73          "When police officers have probable cause to believe that a motor vehicle contains contraband, they may, without a warrant, search any area of the vehicle or any container within the vehicle where they reasonably believe the contraband might be found." *People v. Corral*, 147 Ill. App. 3d 668, 672 (1986) (citing *United States v. Ross*, 456 U.S. 798 (1982)). Probable cause to search a vehicle exists when the totality of the facts and circumstances known to the officer at the time of the search would justify a reasonable person in believing that contraband was present in the vehicle. *Corral*, 147 Ill. App. 3d at 673. In determining whether the officer had probable cause, his or her factual knowledge, based on law-enforcement experience, is relevant. *People v. Smith*, 95 Ill. 2d 412, 419-20 (1983). The emphasis falls on "the totality of the circumstances," or "the complete picture." *People v. Schmitt*, 346 Ill. App. 3d 1148, 1153 (2004). Any one feature of the picture, by itself, might appear innocuous, but when an officer regards the whole picture with a trained eye, he or she might recognize probable

criminal activity. *Schmitt*, 346 Ill. App. 3d 1148, 1153. "Whether probable cause to search exists is a factual inquiry and the trial court's determination on this issue will not be overturned unless it is against the manifest weight of the evidence." *Corral*, 147 Ill. App. 3d at 672.

¶ 74        Here, the trial court's determination Heaton had probable cause was not against the manifest weight of the evidence. At the time of the X-ray, Heaton already suspected the truck contained contraband based on the presence of boxes with different colored tape, which in his experience indicated transportation of contraband. As previously discussed, the bill of lading and other circumstances did not meet industry standards. Another trooper had also noted to Heaton that the truck had been to multiple locations. When the X-ray showed items inconsistent with the bill of lading and individual packages located in boxes situated in the front of the truck, Heaton had probable cause to search those boxes. While not necessary to our determination, we also note the men had already consented to search "the load" of the truck and, when Heaton opened the truck to further do so after it had been relocated, he smelled cannabis. Likewise, he found an unusual amount of cash in the cab of the truck and also smelled cannabis there. Both of those factors further support the determination there was probable cause to search the boxes. Our review of the video reveals no unreasonable delays in performing the search.

¶ 75        Because we have determined Heaton had probable cause to further search the truck and the boxes, we need not address defendant's arguments that the searches of the boxes exceeded the scope of his consent or his authority as a third party to consent to a search of the boxes.

¶ 76                              B. Sufficiency of the Evidence

¶ 77        Finally, defendant contends the State failed to prove him guilty beyond a reasonable doubt. He argues the evidence failed to sufficiently prove he knew he was hauling

contraband.

¶ 78        A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The determination of the credibility of each witness, the weight to be given to his or her testimony, and the resolution of any conflicts in the evidence is within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on those matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). "Moreover, the testimony of a single witness, if positive and credible, is sufficient to prove a defendant guilty beyond a reasonable doubt." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 62. Further, minor inconsistencies in the testimony do not, of themselves, create a reasonable doubt as to a defendant's conviction. *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993).

¶ 79        Here, there was circumstantial evidence defendant was more than a mere driver of the truck. While the men initially told Heaton they picked up the items from a residence and were taking them to Chicago, the bill of lading was dated two months earlier. Grigoryan then admitted they picked up the items from a storage facility. Contrary to what they told Heaton, the truck had been to multiple destinations over the past two months without dropping off the

household goods. Complaints against the company indicated the business made false contracts and used contracts as cover to transport contraband. The purported owner of the goods could not be located or verified, and the trucking company's businesses had disconnected phones. Meanwhile, the men were nervous when stopped and had a large amount of cash, which the State suggested was payment for the transportation of the contraband. Under those circumstances, it was reasonable for the trial court to infer defendant knew he was trafficking contraband. Accordingly, the evidence was sufficient to convict defendant beyond a reasonable doubt.

¶ 80                                    III. CONCLUSION

¶ 81            For the reasons stated we affirm the trial court's judgment.

¶ 82            Affirmed.

*People v. Ivanchuk*, 2025 IL App (4th) 241230

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Logan County, No. 22-CF-223; the Hon. Johnathan C. Wright, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher Grohman, of Benesch Friedlander Coplan & Aronoff LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Bradley M. Hauge, State's Attorney, of Lincoln (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |