NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250155-U

NOS. 4-25-0155, 4-25-0156, 4-25-0157 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 7, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| JERRY D. HUDGENS, | ) | Nos. 21DT822 |
| Defendant-Appellant. | ) | 21CF2076 |
| | ) | 21TR23604 |
| | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court affirmed, concluding (1) the State presented sufficient evidence to sustain defendant's convictions, (2) defendant's trial counsel did not render ineffective assistance by not objecting when a police officer identified defendant as the driver of the vehicle in question, (3) defendant established no error with respect to the trial court allowing the blood and urine test results into evidence, and (4) the armed habitual criminal statute under which defendant was convicted was not facially unconstitutional.

¶ 2     Following a December 2024 jury trial, defendant, Jerry D. Hudgens, was found guilty of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2020)), driving under the influence of drugs (DUI) (625 ILCS 5/11-501(a)(4) (West 2020)), and improper lane use (*id.* § 11-709(a)). He was later sentenced to 16 years in prison for being an armed habitual criminal and fined for the other offenses. Defendant appeals, arguing (1) the State failed to prove he drove the vehicle in question as required to sustain his convictions or, alternatively, it failed to prove the

drugs in his urine rendered him incapable of driving safely as required to sustain his conviction for DUI; (2) his trial counsel rendered ineffective assistance by failing to object when a police officer identified him as the driver of the vehicle; (3) the trial court abused its discretion when it allowed blood and urine test results into evidence; and (4) the armed habitual criminal statute under which he was convicted is facially unconstitutional. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4           At trial, the State presented testimony from (1) two police officers, Cameron Monyelle and Amanda West; (2) a forensic scientist in firearms identification, Julie Steele; (3) a police detective, Paul Reed; (4) an evidence technician, Caroline Summers; and (5) a forensic scientist in toxicology, Jarred Lawson. The State also presented (1) an audio and video recording taken from a camera within Officer Monyelle's squad vehicle; (2) a revolver-style firearm; (3) six rounds of ammunition; (4) photographs of a van and its contents; (5) photographs of a "DUI kit"; and (6) blood and urine samples contained within a sealed bag. Finally, the State presented a stipulation defendant had previously been convicted of two qualifying offenses to support the charge of being an armed habitual criminal. Defendant, who did not appear at trial, did not present any evidence. The following is gleaned from the evidence presented.

¶ 5           Around 6 p.m. on October 22, 2021, Officer Monyelle, an officer with the South Beloit Police Department, responded to a single vehicle accident in the "area of Gardner and I-90" in Winnebago County. Upon his arrival, Officer Monyelle saw "a dark-colored van facing eastbound in the westbound lane, and there was one individual standing outside of the vehicle."

¶ 6           According to Officer Monyelle, it appeared the van's front left tire was out of alignment and deflated. There also appeared to be "some type of liquid trail to the west of the vehicle." A photograph of the van shows it positioned in a driving lane facing against traffic with

its front left tire out of alignment and deflated. The photograph also appears to show it was located in the middle of an overpass.

¶ 7    The individual seen standing outside of the van, who was later identified as defendant, was described by Officer Monyelle as being "in an odd state." Officer Monyelle explained, "He was kind of, like, looking at the front tire of the car; and he appeared to be crying and, like, looking up to the sky and looking left and right kind of, like, lost I guess you would say." Officer Monyelle testified defendant responded when he spoke to him, but "it was kind of more like confusion. And he didn't quite understand exactly what was going on, and he just kept looking at the tire and looking up at the sky and crying while looking around."

¶ 8    Officer Monyelle testified defendant "tried to get into the [van] a few times." Officer Monyelle "intercepted [defendant's] movements" during his first attempt. Officer Monyelle explained, "[Defendant] wasn't very aggressive about getting into the vehicle; but it appeared like he was trying to, so I had to put my arm in front of him" and tell him to step away from the vehicle. Officer Monyelle testified defendant tried to get into the van again after Officer West, also an officer with the South Beloit Police Department, arrived at the scene. On that occasion, "verbal commands prevent[ed] [defendant] from going into the vehicle."

¶ 9    A police sergeant arrived at the scene and administered, as described by Officer Monyelle, a "preliminary" horizontal gaze nystagmus (HGN) test to defendant. Officer Monyelle explained an HGN test is a standardized field sobriety test used to determine if an individual is "under the influence of alcohol or any other substance." When asked about his training with standardized field sobriety tests, Officer Monyelle testified:

> "During basic law enforcement training at the Police Academy they have an extensive class that informs and trains the officer on how to properly conduct and

administer Standardized Field Sobriety Tests and what clues and indications to look for on a subject that you believe to be under the influence of alcohol or any other intoxicating compound."

Officer Monyelle further testified he "pass[ed]" the training. Officer Monyelle observed while his sergeant administered the HGN test to defendant and noticed "Nystagmus in the eye." He explained this was "an indication that somebody is under the influence of alcohol or any other drug." After this finding, Officer Monyelle began administering the "entire" HGN test to defendant but ended it because defendant was not following the instructions. Officer Monyelle testified the inability to follow instructions is a clue of impairment. Officer Monyelle confirmed he administered the HGN test in accordance with his training. At that point, Officer Monyelle arrested defendant for "[DUI] of any intoxicating compound" and placed him in a squad vehicle.

¶ 10        On at least two occasions, Officer Monyelle interacted with defendant while defendant was in the squad vehicle. The interactions were captured on camera and shown to the jury. The video of the first interaction shows Officer Monyelle asking defendant for his name and date of birth. Defendant appears to struggle with providing his date of birth. After the information is provided and Officer Monyelle closes the door to the squad vehicle, defendant appears to repeat his birthday, laugh, and then say, "discombobulated." The video of the second interaction shows Officer Monyelle engaging with defendant after defendant, whose hands were cuffed behind his back, removed his seat belt and moved his cuffed hands underneath his legs.

¶ 11        Officer West testified she responded to the scene after Officer Monyelle. She indicated she did so "[j]ust to make contact with the driver of the vehicle." Upon her arrival, she observed a van "facing eastbound in the westbound lanes of Gardner over the I-90 bridge." Officer West explained she assisted by keeping defendant "situated and sat on the road, because he kept

trying to get access to the vehicle." She also conducted an inventory search of the van. During the search, she discovered a revolver-style firearm between the driver's seat and the center console. The firearm was defaced and loaded with five live rounds of ammunition and one spent round. The firearm was later tested and found to be an operational and functioning firearm. When reviewing photographs of the van and its contents on direct examination, Officer West twice, over no objection, identified a photograph of the van as "the vehicle that [defendant] was driving." On cross-examination, Officer West acknowledged nobody was in the van when she arrived at the scene. She also acknowledged she did not locate any paperwork in the van with identifying information.

¶ 12 Officer Monyelle drove defendant to the hospital after he agreed to provide blood and urine samples. Officer Monyelle observed defendant provide samples to a "tech" at the hospital. The tech then packaged the samples in a DUI kit, which Officer Monyelle described as a white box. Officer Monyelle testified, "[W]e initialed and labeled everything, as appropriate, and sealed the container." He then took the DUI kit to the South Beloit Police Department. Officer Monyelle identified People's exhibit No. 13 as the blood and urine samples collected from defendant and placed inside the DUI kit. He testified the samples appeared to be in the same or substantially the same condition as when he first received them.

¶ 13 Reed, a detective with the South Beloit Police Department, testified, on November 8, 2021, he took the sealed DUI kit from the South Beloit Police Department to the Illinois State Police Forensic Science Laboratory in Rockford, Illinois. He explained a DUI kit is ordinarily a small white box. He gave the DUI kit to Summers, an evidence technician with the Illinois State Police Forensic Science Laboratory in Rockford. Detective Reed testified he "retrieved" the sealed DUI kit on November 18, 2021, and then transported it back to the South Beloit Police Department.

When asked to identify People's exhibit No. 13, he testified it was "the contents of the DUI kit." He explained, "When the DUI kit goes to the lab, they generally don't send that box back." He indicated the contents were in a sealed bag with "some initials and the date." He also indicated there were tags on the bag from the crime lab and from the South Beloit Police Department. Detective Reed testified People's exhibit No. 13 was in the same or substantially the same condition as when he "received it from the Crime Lab." Detective Reed acknowledged each item of evidence is assigned a specific number by the South Beloit Police Department. When asked if People's exhibit No. 13 "reflect[ed] the same number when you took it to the Lab than when you received it," Detective Reed testified:

> "So the item the box sent to the Lab had a tag similar to the one that's on that bag with a different evidence item number. Because I didn't get the box back, I created a new evidence item and placed a new tag on that bag."

¶ 14 Evidence technician Summers testified, on November 8, 2021, she received the sealed DUI kit from Detective Reed at the Illinois State Police Crime Lab in Rockford. She then placed the DUI kit in the evidence vault. When she was asked to identify People's exhibit No. 13, Summers testified it was "from Lab Case DFS 21-040080 from the South Beloit Police Department, Item 2, for the Lab." When asked if it was the item she received from Detective Reed, she testified:

> "Well, technically, this comes back in a different form than when it was received at the lab. It comes into the lab in a box; but when once it has been analyzed it comes back in this form. I did not see it when it came back, but I did see it when it came in, in the box."

¶ 15 Lawson, a forensic toxicologist with the Illinois State Police Forensic Science

Laboratory in Chicago, Illinois, testified, on December 1, 2021, he retrieved a sealed DUI kit from the evidence vault at the Illinois State Police Forensic Science Laboratory in Chicago. The DUI kit had a bar code with a "DFS case number on it," the signature of the person who sealed the box, the agency case number, and a "kit shipping seal." Photographs of the DUI kit indicate it contains information associated with this case, including the names of defendant, Officer Monyelle, and the South Beloit Police Department. They also show it has a DFS case number of 21-040080 and a shipping seal. Lawson testified the DUI kit showed no signs of tampering upon receipt.

¶ 16        Lawson opened the DUI kit and inventoried the items, which included placing the same "DFS case number" associated with the kit on the individual items therein. He then recycled the box per policy and performed tests on the blood and urine samples found within the DUI kit. On December 29, 2021, after the testing was complete, Lawson placed the samples in a bag, sealed the bag, placed his initials and the date on the bag, and placed the bag in the evidence vault. When asked to identify People's exhibit No. 13, he testified it was "the blood tubes and urine bottles that were tested for this case in December of '21." He testified the items were in the same or substantially the same condition as when he placed them inside of the bag.

¶ 17        Lawson testified he performed an ethanol analysis on the blood samples contained within People's exhibit No. 13 and determined the samples did not contain alcohol. Lawson also testified he performed testing on the urine samples contained within People's exhibit No. 13. Before People's exhibit No. 13 was admitted into evidence and Lawson gave testimony about the testing on the urine samples contained therein, defense counsel objected on "chain of custody" grounds. Defense counsel asserted:

> "We have a problem here where we have a DUI kit being dropped off in Rockford
> and then being tested in Chicago. Nobody's identified the DNA—or the DUI kit.

We don't know how it got from one place to another. It's just we have files all of sudden appearing in Chicago that have been *** testified about here today, so I don't believe the foundation has been laid for him to testify."

The State, in response, maintained it laid an adequate foundation based upon the testimony from Detective Reed that the DUI kit was sealed when it was received in Rockford and the testimony from Lawson that the DUI kit was sealed when he received it for testing. The State asserted it did not "need to show every single person that has touched the box" because there was no "evidence that there's any interference with the box." In reply, defense counsel maintained there was insufficient evidence showing "what [Lawson] received in Chicago is the same box."

¶ 18        The trial court overruled the objection and admitted People's exhibit No. 13. Lawson testified the testing on the urine samples indicated the samples were positive for phencyclidine (PCP) and benzoylecgonine, which he indicated was a metabolite for cocaine. Lawson also confirmed PCP is a controlled substance.

¶ 19        In closing, the defense argued, in part, the State failed to prove (1) defendant drove the van or (2) the drugs in defendant's system rendered him incapable of driving. After its deliberations, the jury found defendant guilty of all the charges.

¶ 20        Defendant, in a posttrial motion, challenged the sufficiency of the evidence to sustain the jury's findings and the allowance of the blood and urine test results into evidence. The trial court rejected defendant's challenges after a hearing and then sentenced him to 16 years in prison for being an armed habitual criminal and fined him for the other offenses.

¶ 21        This appeal followed.

¶ 22                                II. ANALYSIS

¶ 23        On appeal, defendant argues (1) the State failed to prove he drove the van as

- 8 -

required to sustain his convictions or, alternatively, it failed to prove the drugs in his urine rendered him incapable of driving safely as required to sustain his conviction for DUI; (2) his trial counsel rendered ineffective assistance by failing to object when Officer West identified him as the driver of the van; (3) the trial court abused its discretion when it allowed the blood and urine test results into evidence; and (4) the armed habitual criminal statute under which he was convicted is facially unconstitutional. The State disagrees with each of defendant's arguments.

¶ 24                                A. Sufficiency of the Evidence

¶ 25        Defendant argues the State failed to prove he drove the van as required to sustain his convictions or, alternatively, it failed to prove the drugs in his urine rendered him incapable of driving safely as required to sustain his conviction for DUI.

¶ 26        When considering a challenge to the sufficiency of the evidence to sustain a conviction, this court "must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Gray*, 2024 IL 127815, ¶ 20. "This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction." *People v. Ivanchuk*, 2025 IL App (4th) 241230, ¶ 78; see *People v. Day*, 2019 IL App (4th) 160217-B, ¶ 47 ("Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer other connected facts that human experience dictates usually and reasonably follow." (Internal quotation marks omitted.)).

¶ 27        This court, when considering a challenge to the sufficiency of the evidence, is mindful "[i]t is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." (Internal quotation marks omitted.)

*People v. Galarza*, 2023 IL 127678, ¶ 25. "[T]he trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." (Internal quotation marks omitted.) *Id.* Furthermore, with respect to circumstantial evidence, the trier of fact need not "be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Id.* ¶ 27.

¶ 28        As charged in this case, a person commits the offense of being an armed habitual criminal by possessing a firearm after having been convicted of two qualifying offenses. 720 ILCS 5/24-1.7(a) (West 2020). A person commits the offense of DUI by driving a vehicle while "under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving." 625 ILCS 5/11-501(a)(4) (West 2020). And, a person commits the offense of improper lane use by driving a vehicle outside a single traffic lane. *Id.* § 11-709(a).

¶ 29        First, assuming, *arguendo*, the State was required to prove defendant drove the van (the State disputes this was required to prove being an armed habitual criminal), we find the State presented sufficient circumstantial evidence by which a jury could reasonably make this finding. See 720 ILCS 5/24-1.7(a) (West 2020); 625 ILCS 5/11-501(a)(4), 11-709(a) (West 2020). The evidence showed Officer Monyelle responded to a report of a single-vehicle accident and observed defendant, alone, outside of a van and looking at it. The van was in the middle of a bypass above I-90, not a residential area. The van was facing oncoming traffic with its front wheel out of alignment and deflated. Defendant then, in the presence of law enforcement officers, repeatedly tried to enter the van. While, as defendant emphasizes, he was not found inside the van, there was nothing in the van associated with him, and there was no evidence of the van's keys, we find the

evidence of the scene of the accident, including the location and condition of the van and defendant's presence alone, along with the evidence of defendant actions, amounted to sufficient evidence by which a jury could reasonably find defendant drove the van.

¶ 30        Second, we find the State presented sufficient circumstantial evidence by which a jury could reasonably find the drugs in defendant's urine rendered him incapable of driving safely, as required to sustain his conviction for DUI. See 625 ILCS 5/11-501(a)(4) (West 2020). Again, the evidence showed defendant drove the van, which was found in the opposite lane of traffic with its front wheel out of alignment and deflated. The evidence also showed defendant was in a state of confusion, struggled to answer questions, and exhibited signs of intoxication when administered the HGN test. And finally, the evidence showed the blood and urine samples collected from defendant after he was arrested tested negative for alcohol but positive for PCP, a controlled substance, and benzoylecgonine, a metabolite for cocaine. While, as defendant emphasizes, the common effects of the specific drugs in his urine were not shown, we find the evidence of the blood and urine test results, including that PCP was a controlled substance, along with the evidence of the signs of impairment on the HGN test, defendant's mental state and behavior, and the location and condition of the van amounted to sufficient evidence by which a jury could reasonably find the drugs in defendant's urine rendered him incapable of driving safely.

¶ 31        We note, with respect to the latter finding, the primary authority relied upon by defendant, *People v. Workman*, 312 Ill. App. 3d 305 (2000), is distinguishable. In *Workman*, the evidence was found to be insufficient to prove both the "defendant was under the influence of a drug" and "it affected his ability to drive safely." *Id.* at 312. The court, in support of its finding, emphasized (1) the absence of testing to determine whether the defendant "had in fact ingested a drug or was under the influence of a drug" and (2) the arresting officer did not have "any significant

experience or expertise in detecting whether a person was driving under the influence of drugs and whether the person was influenced by a drug to such a degree that it prevented his driving safely." *Id.* at 311-12. Additionally, the evidence showed "there was nothing unusual about the way [the] defendant operated his vehicle." *Id.* at 308. Unlike in *Workman*, the evidence in this case showed (1) the urine collected from defendant after he was arrested tested positive for PCP and a metabolite for cocaine, (2) the arresting officer was trained on administering standardized field sobriety tests and found defendant's performance on the HGN tests indicative of a person being under the influence of alcohol or drugs, and (3) the van was not safely driven by defendant. *Workman*, therefore, does not affect our finding.

¶ 32      Accordingly, we conclude, absent any other arguments, the State presented sufficient evidence to sustain defendant's convictions.

¶ 33                                B. Performance of Trial Counsel

¶ 34      Defendant argues his trial counsel rendered ineffective assistance by failing to object to Officer West identifying him as the driver of the van.

¶ 35      "The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel." *People v. Lewis*, 2022 IL 126705, ¶ 44. To establish a claim of ineffective assistance of counsel, a defendant must show *both* (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance of counsel prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); see *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting the *Strickland* standard). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.).

*People v. Domagala*, 2013 IL 113688, ¶ 36. A court "may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 36    We find there is no reasonable probability, but for trial counsel not objecting to Officer West's identification testimony, the result of the proceeding would have been different. Following Officer West's direct examination, her identification testimony was challenged on cross-examination. Specifically, Officer West acknowledged nobody was in the van when she arrived at the scene. Trial counsel then, in closing argument, emphasized the lack of evidence showing defendant was driving the van, and, while the State argued to the contrary, it did not rely upon any identifications by Officer West. Additionally, as indicated above, the State presented sufficient circumstantial evidence by which the jury could reasonably find defendant drove the van. After considering the complained-of testimony from Officer West, the cross-examination of her, the closing arguments, and the circumstantial evidence by which the jury could reasonably find defendant drove the van, we find there is no reasonable probability the result of the proceeding would have been different had trial counsel objected to the identification testimony.

¶ 37    Accordingly, we conclude defendant's trial counsel did not render ineffective assistance by not objecting when Officer West identified defendant as the driver of the van.

¶ 38        C. Admission of Blood and Urine Test Results

¶ 39    Defendant argues the trial court abused its discretion when it allowed the blood and urine test results into evidence. Specifically, defendant asserts the test results should have been excluded because the State failed to establish a sufficient chain of custody for the blood and urine samples in People's exhibit No. 13. Defendant, in support, contends the State provided "no evidence regarding how the [samples] got from Rockford to Chicago or why [they] arrived in

Chicago in different packaging." Defendant also contends the changing of the inventory number by Detective Reed caused "more confusion regarding what happened with the evidence."

¶ 40 At the outset, we consider, although not addressed by the State, whether the alleged errors concerning the admission of the blood and urine test results have been properly preserved for review. "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). The failure to do either results in forfeiture. *Id.* As our supreme court has stated, the rule of forfeiture "is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence." *Id.*; see *People v. Alsup*, 241 Ill. 2d 266, 275 (2011) ("[A] challenge to the chain of custody" "is considered an attack on the admissibility of the evidence and is thus subject to the ordinary rules of forfeiture.").

¶ 41 A timely and specific trial objection is especially important with respect to foundational challenges to the admission of evidence. Such an objection (1) informs the trial court of the grounds for the foundational challenge and (2) allows the State the opportunity to correct any deficiency. See *People v. Bock*, 357 Ill. App. 3d 160, 170 (2005) ("General objections which do not inform the trial court of the basis for the claims of error made on appeal do not preserve the unspecified claims for review."); *Woods*, 214 Ill. 2d at 470 ("[A] defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level."); see also *People v. Bair*, 379 Ill. App. 3d 51, 57 (2008) ("The defendant's general objection of 'foundation' was not sufficiently specific to preserve the issue for review."); *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 53 ("Unless they are obvious from the record, the grounds for an objection must be specifically stated in order to preserve an issue for appeal."). As this court has stated, "[w]e will not impute error to a trial court for failure

to consider a theory not fairly presented;" "its task is to rule on the basis of the theories presented." *People v. Hamilton*, 283 Ill. App. 3d 854, 861 (1996), *rev'd on other grounds*, 179 Ill. 2d 319 (1997); see *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 132 (" 'We are exceptionally reluctant to reverse a trial court's decision based on an argument raised on appeal that the trial court never heard below.' ").

¶ 42 We find the only foundational challenge properly raised and preserved for review is whether the trial court erred when it allowed the urine test results into evidence despite the absence of evidence concerning how the samples got from Rockford to Chicago. First, defendant did not object when Lawson testified about the blood test results, nor did he move to strike the testimony after he later objected to the admission of the blood samples. His challenge to the admission of the blood test results is, therefore, forfeited. Second, while defendant timely objected to Lawson testifying about the urine test results, his foundational objection was not based upon a purported change in packaging of the samples or a change to the inventory number of People's exhibit No. 13. As to the former, defendant, after reviewing the trial transcripts on appeal, highlights an alleged inconsistency stemming from when Detective Reed retrieved the samples and when they were tested in Chicago. He then posits the only possible conclusion is that the packaging of the samples changed between Rockford and Chicago—from DUI kit, to sealed bag, to new DUI kit. Initially, contrary to defendant's assertion, Detective Reed did not testify he retrieved People's exhibit No. 13, the sealed bag, on November 18, 2021; instead, he testified he retrieved the DUI kit on that date. Regardless, another possible conclusion is that Detective Reed was mistaken about when he retrieved the samples. This conclusion is supported by the fact that this issue was not raised below. In fact, defendant, through counsel, appeared to acknowledge the same DUI kit was "dropped off in Rockford and then *** tested in Chicago." Ultimately, the

existence of factual questions and alternative explanations highlights the importance of a timely and specific trial objection—had defendant raised the issue, the State would have had the opportunity to address and clarify the matter. Because the foundational challenges based upon a purported change in packaging of the samples and the change to the inventory number of People's exhibit No. 13 were not presented below, they are forfeited. Thus, the only issue subject to review is whether the court erred when it allowed the urine test results into evidence despite the absence of evidence concerning how the samples got from Rockford to Chicago.

¶ 43       When considering a challenge to a trial court's evidentiary ruling, this court will not disturb the ruling absent an abuse of discretion. *People v. Patterson*, 2014 IL 115102, ¶ 114. This standard recognizes evidentiary rulings are "within the sound discretion of the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion will be found only where the ruling "is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the trial court's position." *People v. Brand*, 2021 IL 125945, ¶ 36.

¶ 44       A trial court, when presented with a foundational objection to the admission of test results on seized evidence that is not readily identifiable, must decide whether the State has shown "reasonable measures were employed to protect the evidence from the time that it was seized and that it was unlikely that the evidence has been altered." *Woods*, 214 Ill. 2d at 467. "Unless the defendant produces evidence of actual tampering, substitution or contamination, a sufficiently complete chain of custody does not require that every person in the chain testify, nor must the State exclude every possibility of tampering or contamination." *Id.* "Even where the chain of custody has a missing link, trial courts have properly admitted evidence where there was testimony which sufficiently described the condition of the evidence when delivered which matched the description of the evidence when examined." (Internal quotation marks omitted.) *Id.* at 467-68.

¶ 45　　　　We cannot say the trial court's ruling to allow the urine test results into evidence despite the absence of evidence of how the samples got from Rockford to Chicago was arbitrary, fanciful, or unreasonable or that no reasonable person would agree with the court's position. The State showed the samples were received in Rockford within a sealed DUI kit. The State also showed the samples were received in Chicago within a sealed DUI kit. The photographs of the DUI kit received in Chicago showed it had markings associated with this case, and Lawson testified the DUI kit showed no signs of tampering upon receipt. While there was a lack of evidence as to how the samples got from Rockford to Chicago, we find the State sufficiently demonstrated the condition of the evidence did not change. In so finding, we reject defendant's assertion that the packaging of the samples changed between Rockford and Chicago, as that fact was not sufficiently established. Therefore, the court's ruling was not an abuse of its discretion.

¶ 46　　　　Accordingly, we conclude defendant has established no error with respect to the trial court allowing the blood and urine test results into evidence.

¶ 47　　　　　　　D. Constitutionality of the Armed Habitual Criminal Statute

¶ 48　　　　Defendant argues the armed habitual criminal statute under which he was convicted is facially unconstitutional. Specifically, defendant asserts section 24-1.7(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.7(a) (West 2020)) violates the second amendment (U.S. Const., amend. II) pursuant to the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

¶ 49　　　　"Statutes are presumed constitutional, and to rebut that presumption, the party challenging a statute's constitutionality has the burden of establishing a clear violation." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *Id.* A party bringing a facial

challenge to a statute, therefore, faces "a particularly heavy burden." *People v. Villareal*, 2023 IL 127318, ¶ 14.

¶ 50 The second amendment, made applicable to the states through the fourteenth amendment (U.S. Const., amend. IV), provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II; see *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (holding the fourteenth amendment incorporates the second amendment, rendering the second amendment applicable to the states).

¶ 51 In *Bruen*, 597 U.S. at 8-10, the Supreme Court recognized the second and fourteenth amendments "protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," as well as "an individual's right to carry a handgun for self-defense outside the home." The Court held, "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and the government "must then justify its regulation by demonstrating that [the regulation] is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 17, 24.

¶ 52 Since *Bruen* was decided, this court has repeatedly found a felony conviction makes an individual not a law-abiding citizen and, therefore, outside of the people protected by the second amendment. See, *e.g.*, *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21; *People v. Huff*, 2025 IL App (4th) 240762, ¶ 16; see also *People v. Bruce*, 2025 IL App (4th) 240706-U, ¶ 23; *People v. Pruitte*, 2024 IL App (4th) 240013-U, ¶ 34; *People v. Stokich*, 2024 IL App (4th) 240192-U, ¶ 45; *People v. Thomas*, 2024 IL App (4th) 240315-U, ¶ 23; and *People v. Gilbert*, 2024 IL App (4th) 231164-U, ¶ 33. Thus, we have held the historical-traditional test set forth in *Bruen* does not apply to regulations affecting a felon's possession of firearms. *Burns*, 2024 IL App (4th) 230428, ¶ 21;

*Huff*, 2025 IL App (4th) 240762, ¶ 16.

¶ 53 We find defendant has not shown section 24-1.7(a) is facially unconstitutional under the second amendment. See *People v. Leonard*, 2024 IL App (4th) 230413-U, ¶¶ 14-15 (rejecting the same claim from another defendant). He fails to convince us to depart from our prior findings and holdings. In fact, he does not even address our prior findings and holdings. As a result, defendant has not met his burden of establishing a clear violation.

¶ 54 Accordingly, we conclude the armed habitual criminal statute under which defendant was convicted is not facially unconstitutional.

¶ 55 III. CONCLUSION

¶ 56 For the reasons stated, we affirm the trial court's judgment.

¶ 57 Affirmed.